UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| ROBERT LEAHY,<br><br>     Plaintiff,<br><br>v.<br><br>CSC,<br><br>     Defendant. | Case No. 1:14v00665-JCC/TRJ<br><br>A JURY IS DEMANDED<br><br>**<u>REDACTED COPY</u>** |

**PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. ii

TABLE OF AUTHORITIES ........................................................................................ iii

I.   INTRODUCTION AND SUMMARY OF ARGUMENT ..................................... 1

II.  FACTUAL BACKGROUND ............................................................................. 2

   A.  Leahy's Hiring and Firing ........................................................................ 2

   B.  Mason Is Biased Against Older Employees, Including Leahy ...................... 3

   C.  The CEO Acquiesced Or Agreed With Jo Mason's Age Bias ...................... 5

   D.  Jo Mason Had The Most Influence On The Firing ..................................... 7

   E.  A Jury Could Find That CSC's Description of Leahy As Abusive is False or Greatly Exaggerated ............................................................................................. 13

   F.  CSC Policy, As Well As Sunita Holzer's Usual Practice, Was at Odds With The Summary Firing of Leahy .......................................................................... 14

   G.  CSC Paid A Large Amount of Cash to Holzer On The Eve Of Her Deposition ............. 17

III. STATEMENT OF MATERIAL FACTS IN DISPUTE .................................... 19

IV.  ARGUMENT .................................................................................................. 20

   A.  The Legal Standard of "But-for Causation" Is Not "Sole Cause;" It Can Be One Of Multiple Factors That Made A Difference ...................................................... 20

   B.  There is Sufficient Evidence for a Jury to Infer that Leahy's Age Made a Difference in CSC's Decision to Fire Him ............................................................................ 21

   C.  Exculpatory Inferences Are For The Jury ................................................ 24

   D.  CSC Attempts to Confuse the Evidence Relating to Leahy ....................... 26

   E.  There Is Abundant Evidence of Dishonesty, Which Can Be Affirmative Evidence of Unlawful Conduct, Including A Corrupt Payment to Holzer to Buy Her Cooperation .... 27

   F.  The "Prevention Doctrine" Protects Plaintiff from Arbitrary or Bad Faith Interference with His Stock Options/RSUs .................................................................. 29

CONCLUSION ........................................................................................................ 30

PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE IN ITS MOTION FOR SUMMARY JUDGMENT ...................................... 31

# TABLE OF AUTHORITIES

*Bacchus v. Tubular Textile LLC*, 2003 WL 21796550, at *4 (M.D.N.C. Mar. 19, 2003) .......... 22

*Behler v. Hanlon*, 199 F.R.D. 553 (D. Md. 2001) ................................................................. 27

*Bell v. Bolger*, 708 F.2d 1312 (8th Cir. 1983) .................................................................. 26

*Burrage v. United States*, 134 S. Ct. 881, 889 (2014) ........................................................ 20

*Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582 (7th Cir. 2011) ........................................... 26

*E.E.O.C. v. W. Elec. Co.*, 713 F.2d 1011, 1014-15 (4th Cir. 1983) ....................................... 22

*EEOC v. Clay Printing Co.*, 955 F.2d 936, 941 (4th Cir.1992) ........................................... 22

*Furnco Const. Corp. v. Waters*, 438 U.S. 567 (1978) .......................................................... 22

*Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 321 (3d Cir. 2000)................... 25, 26

*Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711 (6th Cir. 2006) .......................... 26

*Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009) ................................................ 20

*McDonnell Douglas Corp. v. Green*, 411 US 792, (1973) .................................................... 22

*Montana v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100 (2d Cir. 1989)............ 23

*Moore Bros. Co. v. Brown & Root, Inc.*, 207 F.3d 717 (4th Cir. 2000) ................................. 29

*O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308 (1996) .......................................... 23

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998).......................................... 26

*Parrish v. Wightman*, 184 Va. 86, 92-93, 34 s.e.2d 229, 232 (1945) .................................... 29

*Pena v. Brattleboro Retreat*, 702 F.2d 322 (2d Cir.1983) .................................................... 23

*Postal Service Bd. of Governors v. Aikens*, 460 US 711 (1983) ........................................... 22

*Quinn v. Haynes*, 234 F.3d 837, 845 (4th Cir. 2000)........................................................... 27

*Reed v. Buckeye Fire Equip.*, 241 F. App'x 917, 927 (4th Cir. 2007) ................................... 23

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 US 133 (2000)....................................... 27

*Rhoads v. F.D.I.C.*, 257 F.3d 373, 391-92 (4th Cir. 2001). .................................................. 24

*Rosenow v. Carecore National, LLC*, 2012 WL 1802456, at *5 (D.S.C. May 17, 2012) ......... 22

*Staub v. Proctor Hosp.*, 562 U.S. 411 (2011) ..................................................................... 21

*Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) ...................................... 22

*Waldron v. SL Indus., Inc.*, 56 F.3d 491 (3d Cir. 1995)........................................................ 25

*Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564 (6th Cir. 2003).............................. 25, 26

*Williams v. General Motors Corp.*, 656 F.2d 120 (5th Cir.1981), *cert. denied*, 455 U.S. 943 (1982). ........................................................................................................................ 23

*Williams v. Vitro Servs. Corp.*, 144 F.3d 1438 (11th Cir. 1998) ........................................... 25

## I.   INTRODUCTION AND SUMMARY OF ARGUMENT

Three officials of defendant CSC gathered on January 28, 2014 when the decision was made to fire plaintiff Robert Leahy just weeks before his 62nd birthday: CEO Michael Lawrie, Jo Mason, his Chief of Staff, and Sunita Holzer, the head of Human Resources (who participated by telephone).  CSC's story is that Holzer recommended that Leahy be fired, and Lawrie accepted the recommendation, and that Mason had no role in the decision. CSC Mem. 10.  Wiping Jo Mason's fingerprints off the firing decision is pivotal to CSC's defense, because (according to four non-party witnesses) Mason repeatedly and openly expressed her disdain for older employees and her desire to make CSC's workforce younger.  Mason referred to Robert Leahy in particular as an "old fart" just six days before the January 28 firing decision.

In fact, Mason was the driving force behind Leahy's firing.  CSC's effort to pin the decision on Holzer founders for two reasons.  First, on January 28, Holzer had never met Leahy and had received no negative information about him.  Second, Lawrie had lost confidence in Holzer, and had already decided to fire her before January 28 (when the decision to fire Leahy occurred).  CSC cannot admit Mason's central role because persuasive evidence shows that Mason wanted to get rid of Leahy because of his age.  Holzer is now following CSC's script, but only because CSC paid her $132,500 just before plaintiff took her deposition to secure her cooperation, or so a jury could reasonably believe.

CSC first decided to fire Leahy, then went looking for dirt after the fact.  Significantly, CEO Lawrie testified that he does not fire people based on rumors but only facts, and he claimed that Holzer did a full investigation--but Holzer denies this.  When the smoke clears, what is left is an age-based decision followed by efforts to find criticisms after the fact.

1

## II.   FACTUAL BACKGROUND

### A.     Leahy's Hiring and Firing

Robert Leahy was hired in June 2013, by Jim Finn, the Vice President of Corporate Communications (Finn started in March 2013).  Exh. 1; Finn 49[1]. At the time, CSC was in "turnaround" mode, causing a great deal of stress and upheaval.  Holzer 24-26.  Finn was told to refocus the communications team on external communications, including industry analysts and Wall Street. Finn 49-50.  Finn wanted to improve the quality of his team, and decided to hire very experienced professionals. Finn 49-50.

During his tenure, Jim Finn hired two people, Robert Leahy (age 61) in June 2013, and Richard Adamonis (age approximately 58) in December 2013.  Finn 18-19. Finn attempted to hire a third person, Jeffrey Baum (age approximately 50). Id.  Baum interviewed with a number of people, including Lawrie's Chief of Staff, Jo Mason, on January 21, 2014. Exh. 14; Mason 302-303.  Mason was not interested in Baum, despite his strong qualifications.  Finn 20.

On January 22, the day after Mason interviewed Baum, she attended a meeting with Jim Finn, Mike Lawrie and the head of Human Resources, Sunita Holzer.  Finn wanted approval to hire team members.  Finn 18-19.  Jo Mason told Finn, "Jim, you're hiring old farts like Bob Leahy, people on the way down, not on the way up." Finn depo. 18-19.  Neither Mike Lawrie nor Sunita Holzer objected to Mason's age-biased comments.  Finn 77.  Six days later, on January 28, Mason and Lawrie decided to fire Robert Leahy, and this decision was communicated to Leahy on February 4. Exh. 5, p.3. At the time of his firing, Leahy was two weeks shy of his 62nd birthday. Leahy 17. Finn was fired on the same day. Finn 12.  At the time of his firing, Leahy's

---

[1] Citations to the deposition excerpts will refer to the deponent's name rather than the exhibit number to show attribution, and the Exhibit Index will provide a reference to the exhibit number. Wherever appropriate, the grammar and punctuation of the deposition quotes have been corrected and objections omitted throughout, even though it will not be noted each time.

immediate supervisor (Finn) was pleased with his performance and did not believe that he was

violating CSC's CLEAR values policy as CSC now claims. Exh. 4. When Finn and Leahy were

terminated, Mason was put in charge of the Communications department.  Exh. 22; Lawrie 175.

### B.    Mason Is Biased Against Older Employees, Including Leahy

Jo Mason referred to Leahy as an "old fart" less than a week before she recommended

firing him.  Leahy's boss, Jim Finn, testified about a meeting on January 22, 2014[2]:

> [Ms. Mason] said, "Jim, **you're hiring old farts like Bob Leahy**, **people on the way**
> **down, not on the way up.**"  And I took that to [refer] also [to] Richard Adamonis
> because he was the only other hire I made and he was 58 years of age.  And the night
> before this [1/22/14] meeting, Ms. Mason had an end-of-day meeting with a candidate for
> internal communications named Jeff Baum.  Jeff was approximately 50 years old.

Finn depo. at 18-19 (emphasis added).  Significantly, Finn's testimony was corroborated by Chris

Grandis, a senior communications department employee who became an acting leader in the

department on February 4, 2014, after Finn and Leahy were fired.  Mr. Grandis testified,

> Q  Did you ever hear Jo Mason make any age-based comments?
> A  Yes.
> Q  What did you hear?
> A  She once referenced the words "old fart."
> Q  In what context?
> A  She was asking me who Rich Adamonis was, and I told her and she made a comment
> that **we need to stop hiring old farts** like myself -- she referenced herself -- **and hire**
> **younger professionals**.

Grandis depo. at 137 (emphasis added).  Mason made this comment after Lawrie put her in

charge of the Communications department, when she and Grandis, her new acting lead, were

discussing the other communications employees. Id.

---

[2] CSC disputes Finn's account of this January 22, 2014, although Finn's testimony must be
credited on summary judgment.  However, it is worth noting that there are contemporaneous
emails corroborating Finn's testimony that he met with Mike Lawrie, Jo Mason and Sunita
Holzer on January 22 to discuss various issues, including new hires and the reporting line of the
Corporate Responsibility employee. See Exhs. 15, 16 & 17.

The age theme was a familiar one for Mason. Two administrative employees who sat in

earshot of Jo Mason in an "open plan" office (with no walls separating the desks) testified that

Mason repeatedly made age-biased comments. Scott depo. 9-10. Jackie Scott sat a few feet away

from Ms. Mason, and she heard age-biased comments in the course of her work:

> Q Have you ever heard Jo Mason refer to age in any respect at CSC?
> A Yes.
> Q What have you heard?
> A I have heard her refer generally to the fact that **there were too many old
> people at CSC, that we needed to get rid of them and hire youth.** She was a
> big champion of the university program believing that that was the future of CSC.
> So in terms of general comments about age generally at CSC, I did hear her make
> those remarks.

Scott depo. 19-20 (emphasis added). Jo Mason made similar comments about the members of

CSC's Board of Directors, Scott depo. at 47 ("She has made references to the fact that she thinks

half the board is too old to be serving competently"). Ms. Scott also heard age-biased comments

about Leahy in particular:

> Q Do you have any knowledge of whether or not Jo Mason was involved in the
> decision to fire Bob Leahy?
> A Yes.
> Q What's your knowledge of that?
> A I believe that she was.
> Q What do you base that on?
> A I believe that **she felt that he [Leahy] was old and ineffective and Jim Finn
> had made a bad hire**, and that they weren't going to pay for him to move from
> Florida because he wasn't worth it. And she wasn't sure that he really wanted to
> move from Florida, he just wanted to sit down there and collect a paycheck.
> Q Did Jo Mason say that to you more or less?
> A More or less. I mean, certainly this long -- that's not verbatim, but that was the
> gist of it.

Scott depo. at 58-59 (emphasis added).

Thao Le, whose desk was a few steps from Ms. Mason's desk with no walls in between,

testified that Mason made similar comments to Mike Lawrie:

> Q Can you provide any context or details about those comments, please?

4

A Just overhearing conversations with Mike. I can't -- I don't remember the details.  I have heard here and there "old people," "we have a lot of old people." Nothing specific.

\* \* \*

Q Those comments being which?  When you say Jo made those comments that you might have overheard from time to time, which comments are you --

A About the old people to Mike [Lawrie].

Q The gray -- **too many gray-haired men at CSC?**

A **It's either that or too many old people**.  I don't remember.  A lot of times I sit in my chair and -- with my head down and do my work. I don't try to listen to the conversation.

Le Depo. at 7, 13-14, 19, 22, 34-35 (emphasis added).

**C.   The CEO Acquiesced Or Agreed With Jo Mason's Age Bias**

Most of Jo Mason's age-biased comments were made either to Mike Lawrie or in his presence but Lawrie did nothing to discourage them at the time. See Part II.B.  According to Lawrie himself, he did not tell Jo Mason to stop making age-biased comments at any time until after he received Leahy's demand letter alleging age discrimination in this case.  Lawrie 243-245. From these facts, a jury could infer either that Lawrie agreed with Mason's age-biased statements or acquiesced in them.

These age-biased comments occurred in a context where CSC was making an affirmative effort to change its image away from being a bunch of "gray-haired old men."  A support employee in Human Resources testified that there was an effort to reduce the age of the workforce. Entwistle 25-27.  Two memos from Michaela Lowe provide contemporaneous evidence of CSC's determination to change its image by moving to a younger workforce.

Ms. Lowe is the Communications department employee responsible for relations with Industry Analysts, companies who advise their clients on purchasing decisions in the IT sector. Lowe 6, 14-15; Lawrie 232-233.  Mike Lawrie and Jo Mason were interested in courting favorable opinions with the Industry Analysts. Lawrie 232.  Among other things, CSC hosts an annual Industry Analysts Conference ("IAC"), a two-day event where senior executives meet

with the Industry Analysts. Ms. Lowe helped run the IACs held in June, 2013, and in October 2014. Lowe 12-18. After the June 2013 IAC, she distilled the most important take-away points in a one-page list, including the following concern: "Still have a lot to do around [CSC's] image ('**old gray haired guys,**') and old school ITO," Lowe 20-25; Exh. 6. (emphasis added). Lowe suggested that her IAC summary memo be shared with Mike Lawrie, the CEO. Lowe 26. Lowe testified that she continued to hear feedback about CSC's image of old gray-haired guys as recently as three weeks prior to her deposition in this case, which was in December 2014. Lowe 15-17.

In a later memo, Lowe opposed hiring a well-qualified employee because of his age. Lowe had been asked her opinion about hiring Evan Quinn, a very experienced professional whom she believed was near retirement, saying:

> [I] was thinking about Evan a bit over the weekend. Still agree that would <u>raise the bar demonstrably</u> within the team, but if I were to play devil's advocate, **a hire like that may also perpetuate the reputation we are trying to break (gray haired white male.** I do get teased by the analysts about this) **[B]y getting a younger superstar** (and possible successor if I got hit by a bus) we could shake it up . . .

Lowe 27-29 (emphasis added); Exh. 7. Normally, a hire that would "raise the bar" should be a good thing. Lowe conceded she was referring to age, Lowe 29-35 (explaining "we want to have a team that's made of rock stars but not near retirement") (but compare Lawrie 237-240, brazenly denying that the word "younger" in this memo related to chronological age).

Another example is a memo written to Mason by Tammy Brandt on January 28, 2014, discussing which people to keep from a newly acquired business. Exh. 8. The memo explains the pros and cons of the younger professionals, but the entire description of one of them (Catalano) is merely "old guy." Mason depo. 170-175, Exh. 8. A jury could infer that Mason did not want any more information about Mr. Catalano other than his age bracket.

**D.**    **Jo Mason Had The Most Influence On The Firing**

It is evident that Jo Mason was biased generally against older employees at CSC, and

against Robert Leahy in particular.  CSC says this does not matter, because Mason did not make

the decision to fire Leahy.

The decision to fire Leahy was made in a meeting on January 28, 2014, with three

participants, CEO Mike Lawrie, his Chief of Staff Jo Mason, and the outgoing head of Human

Resources, Sunita Holzer.  Exh. 5, p.3; Holzer 53-55.  Holzer admitted she did not know Leahy

or much about him, and that Mason knew much more. Holzer 149. Holzer testified that Mason

was a decision maker. Holzer depo. 54.

Lawrie reserves the right to approve the firing of employees at the higher levels of CSC.

Holzer 61.  Lawrie did not know Leahy when the decision was made to fire him on January 28,

2014 and so had no firsthand concerns about Leahy.  Lawrie depo. at 9, 147-149.  Significantly,

Lawrie testified that he did *not* fire Leahy:

> Q   And is it your testimony that your decision to fire Robert Leahy was reasoned,
> fair, and balanced?
> A   Well, one, **I did not fire Robert Leahy**.  A recommendation was made to fire
> him, which I accepted.
> *  *  *
> Q   Well, **who had the power of decision making on firing Robert Leahy**?
> A   I think this -- I think in this case **Sunita made the decision** based on a
> recommendation, and I corroborated or agreed with that recommendation.

Lawrie depo. 147-149 (emphasis added).  In the same discussion, Lawrie says he requires facts,

not rumors, and that Holzer conducted an investigation, Lawrie 146-149, yet Holzer denied

conducting any investigation.  Holzer 95, 135.  Because Lawrie did not view himself as the

decision maker, a jury could find that Lawrie was not, in fact, the moving force on the decision.

CSC contends that Holzer was the driving force responsible for Leahy's firing, Lawrie

149.  For her part, Mason testified--falsely--that she played *no role* in the decision to fire Leahy:

> Q. Did you play any role in the decision-making process that resulted in Bob
> Leahy being fired?   A No.
> * * *
> Q Based on your personal knowledge, the decision to fire Robert Leahy was made
> by Sunita Holzer?
> A Correct.

Mason 60-61 (emphasis added) but see Holzer 53-55 (Mason participated in decision); Lawrie

20-21 (asked Mason to investigate); Exh. 5, pp. 1-3 (Mason invovled).  In fact, the evidence

shows that Mason was the prime mover while Holzer knew virtually nothing about Leahy at the

time the decision was made to fire him on January 28.  Significantly, Holzer had never met

Leahy before he was fired.  Holzer 53-55.

CSC contends that it conducted an "investigation" into Leahy.  Holzer -- the one that

CSC now asserts ran the alleged investigation -- testified that she never investigated Leahy at all:

> Q   To your knowledge did anybody at Computer Science Corporation conduct
> an investigation relating to Mr. Leahy?   A  No.
> * * *
> Q  What communications did you have with [HR employee] Kathy Zering
> relating to Bob Leahy in connection with his firing?
> A   I didn't have any because **I wasn't investigating** it.

Holzer depo. at 95, 135, 55 (emphasis added). Lawrie testified that Holzer conducted a formal

investigation, Lawrie 146, yet CSC's interrogatory answers state it was *Mason* he asked to

investigate. Exh. 5, p.1.

Perhaps most importantly, Sunita Holzer directly contradicts CSC's litigation position

that Holzer was the driving force behind the firing, and that Mason had nothing to do with it.

When asked directly at her deposition who first suggested firing Bob Leahy, Holzer testified that

it was Jo Mason.  Holzer depo. at 142-143.  She also testified that, as between her and Jo Mason,

Mason knew much more about Leahy. Holzer depo. 149 ("Q.  As between you and Jo Mason,

who had greater knowledge about what Mr. Leahy did or didn't do?  A.  Jo did. ...")

While Holzer had never met Leahy, Mason had worked on a project with him. Leahy 148-149; Mason 57. Jo Mason orchestrated and led the January 23 meeting with the Communications staff, which CSC now portrays as the pivotal event leading to Leahy's discharge. Exh. 5, p. 2; Holzer 130-131 (Mason organized meeting while Holzer out of the country and she invited Holzer as an afterthought). In short, Jo Mason's fingerprints are all over the decision to fire Leahy.

In its motion, CSC contends that it had three sources of derogatory information about Leahy by January 28, 2014, when the decision to fire him was made: (1) Edda Van Winkle, (2) Mason's January 23 meeting with the Communications staff, and (3) Mark Delisi (Leahy's only direct report). Holzer admitted that she never spoke to Van Winkle about Leahy. Holzer 68-69; 133-34, 53-55; Van Winkle 11. Holzer spoke with Delisi about Leahy a single time, on January 30, 2014 – two days *after* the decision to fire Leahy was made -- and her dated notes of that call confirm the timing. Exh. 2; Delisi 15-17, 47, 84. The email from Delisi with his list of gripes about Leahy was emailed the day after the call, on January 31, 2014, and therefore neither the call nor the email played any part in the decision to fire Leahy. (Holzer initially got the date of the Delisi call wrong, but she confirmed the date written on her notes, Holzer 225-226; 53-55). Nor did Delisi complain to Mason about Leahy. Delisi 15-17, 47, 84. A jury could reasonably find that Delisi's concerns played no part in the January 28 decision.

If Holzer had recommended firing Leahy on January 28, then the only source of information she could have had was the January 23 meeting of the Communications staff. There is a dispute about what was said at that meeting, but there is no conflict whatsoever about who ran it -- Jo Mason. Holzer 130-131. CSC and Mason contend that Leahy was criticized at that meeting, although they offer almost no specifics. CSC's interrogatory response states only that

9

"Mr. Leahy's conduct was mentioned" at that meeting without providing any detail. Exh. 5 p.3.[3]

While Mason and Holzer contend that Leahy was criticized, most of the evidence shows that the January 23 meeting was about Finn, and Leahy was not mentioned at all. The staff members were clear in their testimony that Leahy was not discussed. For example, Anne Eisele testified about the January 23 meeting:

> A   I attended a meeting on January 23rd, as I recall … that I believe is the one you're talking about. I'm hesitating a little because the meeting I'm referring to did not involve or regard Mr. Leahy. It was about Mr. Finn.
> Q   Okay. And only Mr. Finn?
> A As I recall, yes.
> * * *
> Q   Okay. Did you refer to Bob Leahy during the meeting?
> A   I do not recall my having referred to Bob Leahy. I also don't recall other people having done so. But I know -- I don't remember doing it myself. And if I might, the reason I don't recall any discussion certainly volunteered by me, as I can recall, [or] from others about Mr. Leahy at that meeting, I left the meeting feeling it had been about Jim Finn.

Eisele at 84, 100. Christopher Grandis testified similarly:

> Q   Was Robert Leahy mentioned at all during this January 23rd meeting with Jo Mason and the communications staff?
> A I don't remember his name coming up.
> Q Was Robert Leahy mentioned in any way other than by name at this January 23rd meeting with Jo Mason and the communications staff?
> A I don't think so.

Grandis 42; see also Goldstein 21 ("Q. Did Robert Leahy's name get mentioned at all in that meeting?  A. It did not, not as I recollect."); Ashbrook 19 (did not recall Leahy being mentioned at all during January 23 meeting); Sethuraman 28 (did not think that Leahy was discussed at all during January 23 meeting).

---

[3] CSC at times tries to blur the distinction between Jim Finn and Robert Leahy, but it earlier conceded that the decisions were completely separate, and that Leahy was not fired for any conduct of Finn's. Mason 217; Holzer 122-23; Lawrie 29. Accordingly, this discussion is limited solely to information about Leahy that CSC purportedly relied on to fire him.

Accordingly, as of the January 28 firing decision, a jury could find that Holzer had never met Leahy, had not spoken with Van Winkle, had not yet heard any criticism from Delisi, and heard nothing derogatory about Leahy during the January 23 meeting, meaning that Holzer had no factual basis to recommend Leahy's firing.  This is in stunning contrast with Jo Mason who had met Leahy several times and worked on a project with him in late 2013, who spoke with Van Winkle and who conducted the January 23 meeting in person. Unlike Holzer or Lawrie, Mason knew Leahy well enough to know that he was an old gray haired guy.  A jury could find that, to the extent that anyone was considering the continued employment of Leahy on Jan. 28, it was Mason, not Holzer.  Perhaps most crucial, Holzer testified that the first person during the January 28 meeting to recommend firing Leahy was Jo Mason.  Holzer depo. at 142-143.  At that point, Holzer had been publicly criticized by Lawrie and felt like she failed.  Holzer 359-360.  Finn testified that Holzer was treated poorly on this call by Lawrie, and he thought she might be fired. Finn 79-81.  A jury could find this situation caused Holzer to support Mason's idea of firing Leahy.  See Scott 18-19 (Mason's idea to ask Holzer to "make a recommendation" during January 28, 2014, call with Lawrie); Exhs. 19, 20.

The jury could also consider the relative standing of Mason vis a vis Holzer within the company and in the eyes of Mike Lawrie.  As of late January 2014, Lawrie had lost confidence in Holzer, and he had already hired her replacement and decided to fire her.  At the same time, he had enormous confidence in Mason.  Holzer was fired February 12, 2014, just eight days after Leahy was fired.  Exh. 25. The day Holzer was fired was her replacement, Donna Lesch's, first day of work. Holzer 315.  The decision to hire Lesch as Holzer's replacement was made in early January, 2014, about 4-5 weeks before Lesch's start date.  Scott depo. at 89-90.

11

In these circumstances, it is a reasonable inference that Lawrie would not defer to Holzer in the decision whether to fire a high level executive.  In contrast, Jo Mason is an extraordinarily close confidante of Lawrie's who is effectively the number two ranking official at CSC.  Holzer 60-61.



a jury could find that Lawrie valued Mason's input more than the lame-duck opinion of Holzer.

In the same announcement where Lawrie informed employees of Finn's termination, he announced that Jo Mason would be in charge of the Communications department, assisted by Grandis. Exh. 22. A jury can infer two other facts from this:  One, Lawrie continued to hold Mason in high regard, and two, that he would defer to Mason's judgment as to Finn's former direct reports, who were now reporting to her. Lawrie 174-175. Indeed, it is hard to imagine that Lawrie would not ask Mason whether she wanted Leahy on her team.

Mason enjoyed a powerful position and repeatedly made age-biased comments, including about Leahy. On this record, a jury could find that she was more responsible for Leahy's firing.

### E.   A Jury Could Find That CSC's Description of Leahy As Abusive is False or Greatly Exaggerated

CSC tries to paint Robert Leahy as a bully who terrorized the communications team.  A jury could easily reject this characterization.  In fact, Leahy was not a manager (he supervised only one employee and for a very short period of time), and the witnesses' descriptions of his actual behavior are tame compared to CSC's descriptions of him in this litigation.  Witnesses confirmed that Leahy did not curse, physically intimidate or harass anyone.  Van Winkle 37; Eisele 163, Mason 207.  Mostly, he was described as speaking about work related topics in a loud tone.  Eisele 163-164 ("He could become very animated and speak loudly, but I can't think of an example where he yelled at someone."); Delisi 92.  The supposedly inappropriate comments he is accused of making pertain to concerns he expressed that CSC had in the recent past experienced massive layoffs, and that the current CEO had made it clear that the company had six months to turn things around.  Van Winkle 13-17, 20-25, 36-44.  Leahy is accused of reminding his teammates that they needed to demonstrate worth to keep their jobs secure.  Id., Delisi 148-150.  It is not disputed that Leahy demanded excellence, but he was knowledgeable and his editing improved the work product. Delisi 91.  And Leahy did praise Delisi on two out of the three most important written projects Delisi wrote as a direct report, including the most important one. Delisi 127-133.

CSC also tries to imply that staff were fleeing the communications team because of Leahy.  This, too, is overblown and a jury could easily reject it as pretextual.   The two staff CSC featured in this argument regarding Leahy both left the company for better opportunities, and because they (a) felt that they were overworked, and wanted a friendlier work-life balance, and (b) were very concerned about the stability of CSC given the layoffs.  Delisi 60, Van Winkle 63-64; 18, 40-41.  Leahy's only direct report, Delisi, testified that he had started looking to leave

CSC before Leahy was hired because he had seen so many layoffs, and that he did not leave because of Leahy. Delisi 60, 153-154.  Any putative concerns about their interactions with Leahy were at best non-primary, "contributing" factors in their decision to leave.  Van Winkle 23, Delisi 153-154, Exh. 5 (CSC Resp. to 2nd Interrogatories, No. 17 (listing reasons for staff departures that do not include Leahy's conduct)). CSC was losing staff at a very heavy rate in all departments; the company was in turnaround mode and the CEO was telling the public that his chances of succeeding in the turnaround were 50/50.  Lawrie 233, Finn 255.  The other side of the story is that Delisi was a poor writer, over his head in a newly structured Communications department, who bristled at being asked to turn in polished, error-free work despite his approximately ███████ compensation package.  Finn 59; Leahy 62-64, 159-160; Delisi 132-138, 112, 129. The claim that Leahy was a bully who terrorized staff is thoroughly disputed.

**F.      CSC Policy, As Well As Sunita Holzer's Usual Practice, Was at Odds With The Summary Firing of Leahy**

Nothing derogatory about Leahy was discussed in the January 23 meeting that Mason conducted with the Communications staff.  That means that there are only two documented criticisms of Leahy, from Edda Van Winkle and Mark Delisi, both of whom complained about his style.  (In fact, Delisi did not share his complaints until after the firing decision on January 28, so that was not in the mix, see Part II.D.)   CSC fired Leahy without ever speaking with him about his alleged style issues, and without offering him any chance to rebut the charges. Holzer 181; Exh. 52, p. 5.  Moreover, CSC knew that Leahy's immediate supervisor denied that Leahy was acting improperly. Holzer 145.  Holzer as head of HR admitted that no other CSC employee was fired for style issues over the objection of the immediate supervisor. Holzer 75.

If CSC had legitimate concerns, its own policies required it to document them.  But CSC did not do this.  As head of Human Resources, Holzer normally followed HR policy.  CSC's

HRMP 207 provides that it is "the policy of CSC to assist employees in understanding what types of conduct are considered to be appropriate or inappropriate, and, when necessary, to alert employees when corrective action is required." Exh. 3. This policy requires that the employee's supervisor identify problems and counsel the employee (Part 4.2.1.1), that the employee be permitted to respond to any allegations (Part 4.2.1.4), and that the company is "responsible at every stage of discipline for creating a written record of how the incident was investigated, what was learned, the dates and a summary of meetings with the employee, and the employee's explanations of facts…" (Part 4.2.1.5) (No such written record exists here.) The policy also details a series of progressive discipline steps that should be followed, from informal counseling to letter of caution, suspension and termination (Parts 4.2.2 et seq.). The policy provides for termination only after an employee continues to engage in unacceptable conduct after being warned. (Part 4.2.4). Finally, the policy requires a contemporaneous documentation of the investigation and counseling: "Any suspension or dismissal _must_ be accompanied by a written Memorandum of Disciplinary Action containing all of the information in Section 4.2.3.1 … This Memorandum _must_ be . . . approved and signed by the next higher level of management and Human Resources _before the employee is informed_ of the discipline…." (Part 4.2.4.4). No written documentation required by HRMP 207 has been produced, and Holzer is not aware of it existing. Holzer 139-140. Lawrie confirmed that CSC does not fire a supervisor merely for being accused by a subordinate of bad behavior or bullying -- CSC determines what the facts are first "so that a reasoned, balanced, fair decision can be made. Lawrie depo. 146-148.

The absence of contemporaneous documentation, in violation of policy and practice, along with the evidence of looking for dirt after-the-fact, permits a jury to find that alleged style criticisms were not the real reason.

15

The first and only time that Holzer spoke with Leahy was to fire him.  At that point, the decision was final and nothing that Leahy said could have altered it.  Holzer 56-58. But the normal HR practice in such a situation is to talk to the parties involved.  This is what Holzer did in other situations of alleged abusive treatment by managers.  For example, an employee named Stanke complained about being treated poorly by managers, so Holzer spoke to all concerned and helped the managers change their style, and their behavior improved. Holzer 184-188. Another employee named Stein complained about bullying behavior by managers and HR was still investigating the situation seven months later to determine the facts, Holzer 365-369; Exh. 54.  Holzer did not know of anyone being fired based on either Stein's or Stanke's complaints about abusive treatment or bullying. Id. Holzer 185-187, 369.  Similarly, two employees have complained about Mason being abusive, yet she was not fired. Scott 59, Entwistle 29-32.

Holzer explained that, in Leahy's situation, she did not follow CSC policy or her usual practice:

> Q As head of HR, have you ever had situations where a subordinate's complaint about
>     their supervisor turned out not to be accurate?  A  Sure.
> Q Can you give us some examples, please?
> A Subordinates often have issues and concerns about how they're being managed.
> Q Okay. And how, as a HR professional, have you addressed situations where you
>     wondered if subordinate's complaints were well founded?
> A We looked into it.
> Q How?  A  By talking to the manager and talking to the subordinate and talking to
>     other people on the team to see if it was justified.
> Q That was not done in Mr. Leahy's case, correct?
> A Yes. That was not done by me.
> Q Was it done by anybody to your knowledge?
> A Not to my knowledge.

Holzer 147-148 (emphasis added).

In short, CSC fired Leahy over the objections of his supervisor and one week after Jo Mason referred to him as an "old fart." Mason lamented the number of older employees

generally, and often expressed her opinion that the company needed to get younger.  A jury

could reasonably find that Jo Mason was a key player in Leahy's discharge, and that, at a

minimum, the age bias she wore on her sleeve was a "strike" that influenced the firing decision.

### G. CSC Paid A Large Amount of Cash to Holzer On The Eve Of Her Deposition

CSC made a payment of $132,500 to Sunita Holzer in between the date she was served

with a deposition subpoena in this case, and the date she was deposed.  Defendant claims that it

was a "settlement" of Holzer's legal claims, but contemporaneous documentation permits a jury

to find the supposed "settlement" was a ruse – and the real purpose was to funnel a large

payment to Holzer to secure her cooperation and favorable testimony.

Ms. Holzer was initially unwilling to appear for deposition despite receiving a subpoena

but changed her mind after she was paid a large sum by CSC:

> Q    Did you know we had subpoenaed you for deposition at the time this
> settlement [agreement for $132,500] was entered?
> A   Yes.
> *  *  *
> Q    What was said about the issue of your deposition during that settlement
> [meeting with CSC's lawyers]?
> A   That I would be deposed and I'd have to make myself available, and **I didn't
> want to make myself available**.  And then **I wanted payment** from the time I
> was making myself available, and **that's not legally what can be done**.  And the
> conversation about how much time do you need and how many of these other
> cases there are going to be that you're going to need me to be available. That, also.

Holzer depo. 332-334 (emphasis added).

Holzer's lawyer, while agreeing that he was authorized to accept a subpoena on her

behalf, refused to agree to any deposition date for her until October 10, 2014--the same day the

second settlement agreement was signed by CSC and Holzer. Exh. 33, and see also Exhs. 32-46.

The correspondence between Holzer and CSC is damning, as is the timing.  Holzer sent a

demand letter to CSC on June 25, 2014, setting forth a whistleblower claim and a claim that CSC

improperly withheld a bonus.  Exh. 28.  Holzer admitted "there was no merit" to the

whistleblower claim, Holzer 321-322, and she also acknowledged that her low performance rating ("4" on a scale of 1 - 4) meant she was not eligible for a bonus. Exh. 26, Holzer 324, 242, 317-318; Lawrie 256. Lawrie completely rejected her claim that his evaluation of her failed to follow the correct process. Holzer 321-322; Lawrie 216-222, 271-275.

As of September 18, 2014, CSC had offered nothing, and Holzer's attorney sent an email, at 5:51 p.m., that Holzer was going to initiate arbitration. Exh. 32. Just over an hour later, at 6:58 p.m., Holzer's attorney notified CSC that Leahy sought to depose Holzer. Exh. 32. The imminent deposition led immediately to CSC's offer to pay Holzer a large sum. See Exhs. 32-46. The emails show that Lawrie himself personally decided to pay Holzer money (after earlier deciding not to pay her), Exh. 34, and Lawrie admitted it was his decision. Lawrie 256-257; Exh. 38. Holzer's threat of litigation or arbitration had no bearing on his decision to pay Holzer money. Lawrie 280-281.

Significantly, the level of Holzer's cooperation with CSC was an explicit part of the correspondence leading up to the payment. For example, in response to Holzer's negotiating position, CSC wrote, "this confirm's that CSC has agreed to a settlement amount of $132,500. Regarding the cooperation provision, I would like to leave the one she signed in February unmodified, <u>as it must be clear that we are not paying for any cooperation in the Leahy or Finn cases</u>." Exh. 41, p.2.

CSC's counsel met with Holzer in person to sign the agreement. Holzer depo. 356-358. The apparent purpose of the in-person meeting was for CSC to ask Holzer what she was going to say about Mason's "old farts" reference to Leahy at the January 22 meeting. After Holzer told CSC's counsel that she did not recall Mason's "old farts" comment, the October 10 agreement

was then executed, providing for payment of $132,500 on October 18, 2014, five days before Ms. Holzer's deposition.  Exh. 43,  Holzer 358.

Following up on that, CSC wrote on October 20, 2014—after the payment but days before Holzer's deposition—that "[plaintiff counsel's] big problem is I think he believed, based on what Finn told him, that Ms. Holzer would be supportive and he has found out it is the opposite." Exh. 45.

We understand that CSC has proffered an innocent explanation of these events.  But a jury could reasonably decide on this record that Lawrie and Holzer made a corrupt bargain, thereby discrediting Holzer's testimony, and perhaps Lawrie's, too.

## III.   STATEMENT OF MATERIAL FACTS IN DISPUTE

Pursuant to Local Rule 56(b), plaintiff submits that the following issues are disputed, and the evidentiary support for these issues is found in the sections referenced.

1.      Whether Jo Mason and/or Mike Lawrie were biased against older employees? Part II.B.

2.      Whether, based on the facts known by the decision makers at the time of the decision, Leahy's firing was consistent with CSC's policies or practices? Part II.E and II.F.

3.      Whether Mason's role in Leahy's firing was sufficient to affect the outcome of the decision? Part II.D.

4.      Whether Sunita Holzer, or anyone else, conducted an investigation of Robert Leahy before he was fired? Part II.D.

5.      Whether Mason, Holzer and/or Lawrie lied in denying the age biased comments of Mason? Part II.B.

6.      Whether Lawrie or Holzer lied about the reasons that Lawrie agreed to pay a large sum of cash to Holzer on the eve of her deposition? Part IV.E.

7.      Whether age made a difference (was a but-for cause) in Leahy's firing? Part II.A - II.F, Part IV.B - IV.E.

8.      Whether CSC is accurately describing Leahy's conduct, and whether his actual conduct was sufficient to cause his firing? Part II.E., Part IV.E.

9.      Whether CSC arbitrarily, without sufficient justification or in bad faith prevented Leahy from obtaining his stock options and RSUs?  Part II.A - II.F, Part IV.B - IV.F.

## IV.   ARGUMENT

### A.   The Legal Standard of "But-for Causation" Is Not "Sole Cause;" It Can Be One Of Multiple Factors That Made A Difference

To prove age discrimination, a plaintiff need only show that age was *a* "but-for cause," not the only cause or the most important cause in an employment action.  CSC cites *Gross v. FBL Financial Services, Inc.,* 557 U.S. 167 (2009) (CSC Mem. 13), but neglected to cite the later case that clarified the language of *Gross*.  *Gross* referred to age as having to be "the" but-for cause (which prompted some employers to argue for a restrictive view) but the Court corrected this impression:

> we held that "[t]o establish a disparate-treatment claim under the plain language of [§ 623(a)(1) ] ... a plaintiff must prove that age was [a] 'but for' cause of the employer's adverse decision." *Gross v. FBL Financial Services, Inc.,* 557 U.S. 167, 176, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009).

*Burrage v. United States*, 134 S. Ct. 881, 889 (2014) (alteration of "the" to "a" made by the Court).  The Court explained further that a "but-for cause" can be one of several causes as long as there is a reason to believe it made a difference in the outcome:

> The same conclusion follows if the predicate act combines with other factors to produce the result, so long as the other factors alone would not have done so -- if, so to speak, it was the straw that broke the camel's back.

*Burrage v. United States*, 134 S. Ct. 881, 888 (2014) (citations omitted) (but-for cause can be established even it's effect was only incremental to other causes).  The "straw that breaks the camel's back" presupposes the existence of other straws.  Thus, in a "three strikes and you're out" disciplinary system, each of the strikes is a but-for cause, because removing any one of the strikes changes the outcome.

As applied to this case, Leahy does not have to refute all criticism to prevail.  A jury can find in favor of Leahy even if it credits some of the style criticism leveled at him, so long as the

jury finds that age was also one of the strikes against him.  In this regard, as explained in Part II.E., CSC's notion of Leahy as a bully is disputed and could be rejected by a jury.

Additionally, while there is sufficient evidence to find that Lawrie shared the age bias of Mason, that finding is not necessary.  Mason was acting as an agent of CSC and the company is liable for Mason's discriminatory role in Leahy's firing if it affected the final outcome <u>whether or not</u> Lawrie shared her age bias.  *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011) (discriminatory animus of non-decision maker is imputed to company if her bias influenced the decision).

Unable to mount a convincing case against Leahy, CSC often attempts to blur the distinction between Jim Finn and Robert Leahy.  In assessing CSC's motion, the Court should disregard evidence relating only to Finn, see discussion in Part IV.D.

### B.     There is Sufficient Evidence for a Jury to Infer that Leahy's Age Made a Difference in CSC's Decision to Fire Him

The crux of CSC's argument is premised on a false choice, namely that a plaintiff must either establish all elements of a narrowly articulated prima facie case, or must have "direct evidence" of discrimination.  Even if direct evidence were required -- and it is not -- the testimony of Jackie Scott satisfies this standard.  Scott depo. at 58-59 (Mason relied in part on Leahy's age in connection with his firing).[4]

Direct evidence is not required, however, so long as there is some record evidence, whether labeled "direct" or "circumstantial," that age made a difference.  CSC notes that it chose not to replace Leahy, arguing that this decision by the company forecloses any option of proving a case based on circumstantial evidence.  CSC Mem. 14-15.  Not so.  A prima facie case is

---

[4] In a lame effort to deflect the evidence, CSC argues that the phrase "old fart" has nothing to do with age.  CSC Mem 16.  Multiple dictionaries--including a United Kingdom (UK) dictionary of slang--define "old fart" as being a derogatory term for the elderly.  Exhs. 47-50.  In addition, Lawrie admitted that "old fart" is an offensive term and he told Mason to stop saying it (but only

flexible and adaptable, varies with the factual situation, and was never meant to be as onerous as CSC suggests:

> The burden of establishing a prima facie case of disparate treatment is not onerous. The plaintiff must prove by a preponderance of the evidence that she applied for an available position for which she was qualified, but was rejected under <u>circumstances which give rise to an inference of unlawful discrimination.</u>

*Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (footnotes and citations omitted, emphasis added); *McDonnell Douglas Corp. v. Green*, 411 US 792, 802 n. 13 (1973) (*prima facie* elements will vary with the facts of case).  "The central focus of the inquiry in a case such as this <u>is always whether the employer is treating 'some people less favorably</u> than others because of their race, color, religion, sex, or national origin.' . . . The method suggested in *McDonnell Douglas* for pursuing this inquiry, however, **was never intended to be rigid, mechanized, or ritualistic**." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577 (1978) (citations omitted, emphasis added); see also *Postal Service Bd. of Governors v. Aikens*, 460 US 711, 715 (1983) (citations omitted, emphasis added).

CSC's assertion that it is immunized from any age discrimination claim because it decided not to hire a replacement for Leahy's position is a non-starter.  Where, as here, the employee is not replaced, the fourth element of a *prima facie* case may be satisfied "by showing that the employer did not treat age neutrally in deciding to dismiss the plaintiff." *EEOC v. Clay Printing Co.*, 955 F.2d 936, 941 (4th Cir.1992); *E.E.O.C. v. W. Elec. Co.*, 713 F.2d 1011, 1014-15 (4th Cir. 1983) (same); *Bacchus v. Tubular Textile LLC*, 2003 WL 21796550, at *4 (M.D.N.C. Mar. 19, 2003); 2012 WL 1802456, at *5 (D.S.C. May 17, 2012) (holding that the fourth element required to establish a *prima facie* case for age discrimination "may be met under

---

after Leahy sent a demand letter).  Lawrie depo. 137 ("…, yeah, I think it is offensive."), 243-248 (told Mason to stop saying "old farts").

any circumstances giving rise to an inference of age discrimination."). Other circuits have adopted a similar approach.  See, e.g., *Montana v. First Fed. Sav. & Loan Ass'n of Rochester,* 869 F.2d 100, 104 (2d Cir. 1989)  ("we have previously tailored the four elements of a *McDonnell Douglas prima facie* case to permit a plaintiff in a non-reduction-in-force case to make a *prima facie* showing of age discrimination without establishing that she was replaced by a younger employee. *Pena v. Brattleboro Retreat,* 702 F.2d 322, 324 (2d Cir.1983) (fourth element satisfied by showing "*(4)* the discharge occurred under circumstances giving rise to an inference of age discrimination."); *Williams v. General Motors Corp.,* 656 F.2d 120, 129–30 (5th Cir.1981), *cert. denied,* 455 U.S. 943 (1982).

Indeed, in *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308 (1996) the Supreme Court struck down a similar approach to what CSC urges here in the *prima facie* case analysis in an age discrimination claim (the requirement of proving that the plaintiff was replaced by someone "outside the protected class" – (i.e., younger than 40), and held that the *prima facie* burden is merely to produce "evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion." Id., at 313.  Leahy has satisfied this minimal burden.

Alternatively, another way to meet a prima facie case of age discrimination in circumstances where the company chose not to hire a replacement, is by showing that his duties were transferred to younger employees, *Reed v. Buckeye Fire Equip.*, 241 F. App'x 917, 927 (4th Cir. 2007). CSC's Rule 30(b)(6) designee testified that Leahy's duties were distributed to the remaining Communications staff, all of whom were younger. Mason depo. 279-280.

Here, there is simply no doubt that Robert Leahy has produced sufficient evidence to establish a prima facie case.  And as the Court of Appeals for this Circuit has explained, on

summary judgment the trial court should review all the evidence, whether labeled direct, circumstantial or prima facie, to see if all the relevant evidence combined is sufficient to show that an issue of material fact exists on whether discrimination affected the decision:

> On the one hand, "an employee may utilize 'ordinary principles of proof using *any direct or indirect evidence relevant to and sufficiently probative of the issue*.' " *Brinkley,* 180 F.3d at 607 (quoting *Tuck v. Henkel Corp.,* 973 F.2d 371, 374 (4th Cir.1992)). To avoid summary judgment, "the plaintiff 'must produce direct evidence of a stated purpose to discriminate *and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact.*' " *Id.* (quoting *Goldberg v. B. Green & Co.,* 836 F.2d 845, 848 (4th Cir.1988)) (alteration in original). " 'What is required is evidence of conduct *392 or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision.' " *Id.* (quoting *Fuller v. Phipps,* 67 F.3d 1137, 1142 (4th Cir.1995)).

*Rhoads v. F.D.I.C.*, 257 F.3d 373, 391-92 (4th Cir. 2001). Here, Leahy has easily produced sufficient evidence to withstand summary judgment. Four witnesses have testified to statements by a decision-maker (Jo Mason), close in time to the firing, about her disdain for older workers in general, her reference to Leahy as an old fart in particular, and her desire to make CSC's work force younger. In addition, there is ample evidence for the jury to reject CSC's explanations for firing Leahy, since the evidence that he acted inappropriately is extremely weak, there was no investigation of him prior to the firing decision, CSC contravened its own policies by failing to ever counsel him before he was fired or document the facts, and CSC treated him far worse than other managers accused of bullying behavior.

### C.  Exculpatory Inferences Are For The Jury

CSC apparently is urging this court to draw a number of inferences in its favor. Of course, on summary judgment, inferences can only be drawn in favor of the non-moving party, Leahy, so CSC's proffered inferences must be reserved for argument at trial.

1. <u>Same actor inference</u>. There is no place in this case for any "same actor" inference because different people hired and fired plaintiff. Leahy was hired by Jim Finn and fired by his

successor, Jo Mason. Holzer 53, 142-143; Exh. 4; Lawrie 249-253. Mason herself testified that being an interviewer is not the same as making a hiring decision. Mason 36. In addition, when Mason interviewed Leahy, Finn was the recently-hired VP of Communications reporting directly to the CEO, and Leahy was Finn's first new hire. It would hardly be surprising if Mason chose not to oppose Leahy's hiring in such circumstances notwithstanding a general preference for younger employees. *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 321 (3d Cir. 2000) (employer does not have to discriminate all the time to be liable).

As a matter of law, the same actor inference is only an inference, nothing more. As such, whether to draw that inference and what showing may be sufficient to rebut it is reserved for the jury, as several other circuits have recognized, e.g., *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 496 n.6 (3d Cir. 1995) (impact of same actor inference is for jury to weigh, not for the court at summary judgment); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 573 (6th Cir. 2003) (same actor inference is permissible for jury but cannot be drawn in favor of moving party at summary judgment stage, relying on Supreme Court authority); *Williams v. Vitro Servs. Corp.*, 144 F.3d 1438, 1443 (11th Cir. 1998) (same actor " inference is a permissible—not a mandatory—inference that a jury may make" and cannot be drawn in favor of the moving party on summary judgment). But since CSC cannot show that the same actors hired and fired Leahy, this argument is pure sleight of hand.

2. <u>Same group inference.</u> CSC may imply that summary judgment is appropriate because the decision makers were in the same protected age category, i.e., over 40. Mason was 46 at the time of the firing, albeit almost 16 years younger than Leahy. Mason depo. 177. That age gap is sufficient to defeat the "same group" inference as a factual matter, and, just as importantly "[t]his inference has been explicitly rejected by the Supreme Court in the context of race and sex

discrimination." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir. 2003), citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) and the rejection of such an inference "applies with equal force to proof of age discrimination.". *Wexler,* 317 at 574.

    3.  The Token Employee (or Favorably Treated Protected Class Member) Inference.
CSC implies that the fact that Rich Adamonis was not fired immunizes it. CSC Mem. 21. Again, the primary answer is factual in that Adamonis had just commenced working at CSC in mid-December 2013, he worked in New York rather than Falls Church, and Mason apparently did not know him. Grandis 137 (after Finn's firing, Mason asked Grandis who Adamonis was).

    But this inference also fails as a legal matter because a plaintiff does not need to show that 100% of the people in his protected class were treated poorly, only that he was treated poorly because of an unlawful trait. *Goosby*, 228 F.3d at 321 ("Clearly, an employer does not have to discriminate against all members of a class to illegally discriminate against a given member of that class." (opinion joined by Alito, J.)); *accord Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 720 (6th Cir. 2006); *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011); *Bell v. Bolger*, 708 F.2d 1312, 1318 (8th Cir. 1983).

    **D.**    **CSC Attempts to Confuse the Evidence Relating to Leahy**

    CSC at times attempts to blur the distinction between Jim Finn and Robert Leahy.  In assessing CSC's motion, the Court should disregard evidence relating only to Finn because Leahy was not fired for any aspect of Finn's conduct.  Mason depo. 217 ("[D]id CSC fire Robert Leahy because of the conduct of Jim Finn?  A No, I don't believe that's true."); Holzer depo. 122-23 (Leahy not fired because of Finn's conduct); Lawrie depo. 29 ("Q Was Robert Leahy fired for any actions or conduct of Jim Finn? A No.").  Thus, CSC's efforts to paint Finn as a poor leader (although disputed) have no bearing on the decision to fire Leahy and a jury could disregard all such assertions.

As an example of this blurring, CSC cites an email exchange with McKinsey consultant Sandeep Sethuraman where Finn used the abbreviation WTF. CSC Mem 8.  Based on this email, Sethuraman told Mason that Communications had a toxic environment. This email and comment does not reflect on Leahy who merely received that email along with others.[5]

Another example of the effort to paint with an overbroad brush comes from Holzer. Holzer attempted to impute to Leahy the criticism that was made about Finn, as even her notes reflect.  Compare Holzer 54-55, 71, 134 (asserting that Bob does not acknowledge people or talk to others) with 220-223 (conceding that her notes reference Finn rather than Leahy on most of these issues).  Delisi confirmed that he made those complaints about Finn, not Leahy.  Delisi 85-86.  Indeed, all references to the January 23 staff meeting are misdirection of this sort, because the Communications staff members testified that Leahy's conduct was not discussed in that meeting, only Finn was discussed.

> ### E.    There Is Abundant Evidence of Dishonesty, Which Can Be Affirmative Evidence of Unlawful Conduct, Including A Corrupt Payment to Holzer to Buy Her Cooperation

CSC made a large cash payment to Sunita Holzer in between the date she was served with a deposition subpoena and the date she was deposed. See Part II.F.  When defendant makes a large cash payment to a key witness on the eve of a critical deposition, it has the potential to skew testimony and can be explored on cross-examination much like a witness who accepts a plea bargain to testify against a criminal defendant, *Quinn v. Haynes*, 234 F.3d 837, 845 (4th Cir. 2000) ("[o]ne of the most important factors affecting credibility is the presence of any bias, prejudice or incentive on the part of a witness to favor one party to the litigation" (internal quotes and citations omitted)). Defendant claims that it was a "settlement" of Holzer's legal claims, but

---

[5] Finn testified that he mistakenly hit "reply all" on this email which was intended to be a private comment Finn 220.  Other employees agreed that WTF is acceptable in a private email Grandis

the contemporaneous documents permit a jury to find the supposed "settlement" was a ruse to funnel a large payment to Holzer to secure her cooperation and favorable testimony.

Evidence of bias, interest, partiality or a financial relationship with a party are always admissible for a jury to evaluate the credibility of a witness. *Behler v. Hanlon*, 199 F.R.D. 553, 557 (D. Md. 2001). As the Court of Appeals has emphasized: "Examples of relationships or circumstances that permit a finding of bias or prejudice are nearly limitless, and include: love, hate, fear, family relationship, sexual preference, financial interest in outcome, *business relationship*, membership in an organization, shared beliefs, *payment by a party such as that made to an expert witness* . . . " Id. (internal quotes and citations omitted).

A jury could find that Lawrie and Holzer entered into a corrupt bargain to pay her a large sum to secure her favorable testimony and then denied it. This type of mendacity is equivalent to "flight from the scene of a crime," and such mendacity can be powerful affirmative evidence of a guilty motive. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 US 133, 147 (2000).

As shown above, there are various other points on which a jury could conclude that one of the key witnesses is lying. For example, Mason testified that she had no role at all in the decision to fire Leahy, Mason depo. 60-61, while Holzer testified that Mason was part of the decision and was the first to recommend Leahy's firing. Holzer depo. 142-143, 54. For another example, Lawrie and Holzer both claimed they could not recall Mason referring to Leahy as an old fart, though they were both present according to Finn, and Mason admits to regular use of the phrase. Mason 175. Similarly, Lawrie's testimony shows that he understood the legal significance of insisting that Holzer alone was responsible for Leahy's firing and that Mason was not involved. Lawrie 181-182, which provides a motive for him to shade his testimony and deny

---

83-84; Van Winkle 71.

Mason's substantial role.  There is ample support for a jury to find some or all of this testimony to be mendacious, intentional lies to cover up powerful evidence of an unlawful motive.

### F.   The "Prevention Doctrine" Protects Plaintiff from Arbitrary or Bad Faith Interference with His Stock Options/RSUs

Leahy's contract claim is based on the "prevention doctrine."  Leahy can prevail on this claim if the jury finds the was fired arbitrarily or without cause.

The Fourth Circuit recognized that Virginia embraces the common law prevention doctrine, *Moore Bros. Co. v. Brown & Root, Inc.*, 207 F.3d 717, 725 (4th Cir. 2000) ("The prevention doctrine is a generally recognized principle of contract law according to which if a promisor prevents or hinders fulfillment of a condition to his performance, the condition may be waived or excused." (internal citations omitted)).  As further explained,

> The prevention doctrine does not require proof that the condition would have occurred "but for" the wrongful conduct of the promisor; instead it only requires that the conduct have "contributed materially" to the non-occurrence of the condition. . . . The Supreme Court of Virginia does not require the plaintiff to prove "but for" causation. Rather, as that court specifically noted, "[i]t is as effective an excuse of performance of a condition that the promisor has hindered performance as that he has actually prevented it."

*Moore Bros.*, 207 F. 3d at 725 (internal citations omitted); *see also Parrish v. Wightman*, 184 Va. 86, 92-93, 34 s.e.2d 229, 232 (1945) ("Where a contract is performable on the occurrence of a future event <u>there is an implied agreement that the promisor will place no obstacle in the way of the happening of such event</u>, particularly where it is dependent in whole or in part on his own act; and, <u>where he prevents the fulfillment of a condition precedent or its performance by the adverse party, he cannot rely on such condition</u> to defeat his liability." (emphasis added, internal quotes and citations omitted)).

Leahy did not have to do anything other than be employed through the vesting date to benefit from his stock options and RSUs (Restricted Stock Units):

Q And is Mr. Leahy required to do anything other than be employed through July 15th, 2016 to get his RSUs?  A That would be my understanding.
* * *
Q Other than remaining an employee, was there any other requirement for Mr. Leahy to do to qualify for stock options?   A Not that I'm aware of.

Rule 30(b)(6) Designee Lesch depo. at 60-61.  In contract terms, the only reason that Leahy failed to satisfy the "condition precedent" to vesting for his stock/RSUs was that CSC "prevented" him from satisfying the condition (i.e., by firing him).  The "prevention doctrine" holds that a party to a contract cannot act arbitrarily to prevent the other party from obtaining the contractual benefit by preventing that party from satisfying a condition precedent.  Here, this means that if CSC's actions in terminating Leahy's employment were arbitrary or in bad faith— regardless of whether it was discriminatory—Leahy is excused from the condition (of being employed) and can still obtain the contractual benefits, here, the stock options and RSUs.

## CONCLUSION

There is abundant evidence of age bias on the part of Mason which Lawrie either shared or acquiesced in.  On this record, there is sufficient evidence for a jury to find that the style issues alleged by CSC either were not true, or were not sufficient by themselves to warrant Leahy's termination, and that his age was a but-for cause in his firing.  The credibility of the witnesses and the inferences to be drawn from this evidence are factual disputes which must be resolved by the jury.  Accordingly, summary judgment is not appropriate in this case.

_/s/_____
Stephen Z. Chertkof (34243)
Richard A. Salzman* (*admitted pro hac vice*)
HELLER, HURON, CHERTKOF & SALZMAN
1730 M Street, NW, Suite 412
Washington, DC  20036
(202) 293-8090
szc@hellerhuron.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| ROBERT LEAHY,<br><br>    Plaintiff,<br><br>v.<br><br>CSC,<br><br>    Defendant. | Case No. 1:14v00665-JCC/TRJ<br><br>A JURY IS DEMANDED<br><br>**FILED UNDER SEAL** |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS
NOT IN DISPUTE IN ITS MOTION FOR SUMMARY JUDGMENT**

Plaintiff hereby responds to Defendant's Statement of Material Facts Not In Dispute in its

Motion for Summary Judgment.  We respond using the numbers assigned by defendant.

References to exhibits refer to the exhibits attached to plaintiff's opposition to summary

judgment.

1. - 4.  Plaintiff does not dispute these for purposes of the motion.

5.  CSC maintains human resources policies requiring employees "to conduct and

present themselves at all times in a highly professional and reliable fashion and to be sensitive to

circumstances in which their conduct is not acceptable." Unacceptable conduct includes

"[c]onduct which demonstrates lack of desire or ability to work in the spirit of harmony or

cooperation with the efforts of coworkers, customers, subordinates, or superiors, including

unlawful discriminatory behavior of any type" or "[a]ny conduct, whether verbal, physical or

both, which is inappropriate, indecent, or so disruptive of the work environment that it has no

place in a professional setting." CSC HRMP No. 207, "Employee Conduct," at 1-3 (Exh. F).

Response:   The policies speak for themselves, but the issue is how these policies are

enforced and what, if any, disciplinary action is taken.  It is disputed whether this policy was

31

followed in Leahy's case, or followed consistently with other situations.  See Pltf's Opp. to Sum.

Judg., at Part II.F.


      6.     Plaintiff does not dispute this for purposes of the motion.


      7.  Beginning at least as early as December 2013, CSC's CEO, Michael Lawrie,  received

reports of behavioral issues by the leadership of the Corporate Communications group.  Lawrie

Dep. at 10:5-20, 167:6-11 (Exh. B). He also learned that a number of employees in that  group

had resigned; according to an e-mail to him from Mr. Finn, the number was seven of fewer  than

30 in the group during the previous 3-6 months. E-mail from Lawrie to Finn, Jan. 17, 2014

(Exh. H). He had also heard from some of Finn's peers at CSC that he had lost credibility with

them and had exhibited erratic behavior. Lawrie Dep. at 43:8-14, 60:9-22 (Exh. B).

    <u>Response</u>:    This is disputed but largely immaterial as complaints about Finn have

nothing to do with the firing of Leahy.  Pltf's Opp. to Sum. Judg., Part IV.D.


      8. During December 2013, Jo Mason learned from Edda Van Winkle, a senior  executive

in the communications group who had unexpectedly submitted her resignation, that  there was a

poor environment in the group and that Leahy's "manner, and behavior, and values  did not align

with the team." Van Winkle Dep. at 20:22-21:1 (Exh. I). She also reported to  Mason that she

had a negative encounter with Leahy—who was her peer, not her boss, and had  been at CSC

only a few weeks—in which he "told me in a threatening manner that I had six  months to prove

myself . . . ." Van Winkle Dep. at 16:10-17:19, 19:14-21:12 (Exh. I); Mason  Dep. at 105:1-

108:3 (Exh. D). Mason also learned from a McKinsey consultant of an  intemperate and profane

e-mail sent by Finn on December 19, 2013, to no fewer than eight other employees in his group. Mason Dep. at 69:9-19 (Exh. D); Sethuraman Dep. at 13:12-14:18 (Exh. J); E-mail from Sethuraman to Mason, Dec.19, 2013 (Exh. K). The McKinsey consultant also told Mason there was a "toxic environment" in the communications group. Sethuraman Dep. at 15:5-15 (Exh. J); Mason Dep. at 68:2-12 (Exh. D). Mason informed Lawrie and Sunita Holzer, CSC's Vice President of Human Resources, that she thought there was a problem in the group based on these reports. Mason Dep. at198:21-199:6, 213:4-19 (Exh. D); Holzer Dep. at 68:21-69:10 (Exh. L).

    <u>Response</u>:    This is disputed. Prior to being deposed in this case, Edda Van Winkle responded to a request for derogatory information regarding Leahy by saying that all she had "only hearsay." Exh. 53; Van Winkle 32; Grandis 23-24. From this, a jury could find that Van Winkle did not have any firsthand complaints about Leahy at the time. However, even if the jury credited Van Winkle's deposition testimony, she had only two concerns which are both minor. One was that Leahy allegedly bragged about having earned a lot of money in his career, and the other was that Leahy allegedly told her that, because of the turnaround, Lawrie had given all of them only six months to prove themselves, including her. Van Winkle 17, 39. A jury could find that, to the extent these comments were actually made, they merited nothing more than a "talking to."

    In addition, the citations to Sethuraman and the "intemperate email" relate only to Finn and have no bearing on Leahy's discharge. See response to No. 7, Sethuraman 14-15 (he described toxic environment based primarily on Finn's email which contained the abbreviation "WTF.")

9. Based on this information, and other "noise" he had heard about Finn's conduct,  Mr. Lawrie asked Ms. Holzer to investigate the situation in the communications group and come  to him with recommendations. Lawrie Dep. at 9:20-10:15 (Exh. B). He also asked Ms. Mason  to meet with the communications group employees to get their feedback. Lawrie Dep. at 63:21-64:6 (Exh. B).

> <u>Response</u>:        This is disputed.  Holzer testified that she never investigated Leahy at all:
>
>> Q   To your knowledge did anybody at Computer Science Corporation conduct an investigation relating to Mr. Leahy?  A  No.
>> * * *
>> Q   What communications did you have with [HR employee] Kathy Zering relating to Bob Leahy in connection with his firing?
>> A    I didn't have any because **I wasn't investigating** it.

Holzer depo. at 95, 135 (emphasis added). CSC's interrogatory answers state it was *Mason* he asked to investigate. Exh. 5, p.1. Jackie Scott testified that it was Jo Mason who asked Holzer to make a recommendation to Lawrie. Scott 18-19, Exh. 21.


10. Before the meeting occurred, another senior employee in the communications  group, Mark Delisi, who headed CSC's Corporate Social Responsibility program, submitted his resignation on January 21, 2014. Resignation Letter from Delisi to Leahy, Jan. 21, 2014  (Exh. M). Mason spoke to Delisi when she learned of his resignation and Delisi expressed his concerns about the behavior of Leahy, aboutFinn condoning Leahy's conduct, and that the environment in the communications group was "toxic." Mason Dep. at 219:6-14, 220:15-221:12, 285:20-286:20 (Exh. D).

> <u>Response</u>:        This is disputed.  Delisi testified that he never complained about Leahy to Mason.  Delisi 15-17, 47, 84.  Delisi testified that he did complain about Leahy to Holzer, but only on one occasion, on January 30, 2014, which was *after* the decision was made to fire Leahy.

Exh. 2; Delisi 15-17, 47, 84; Holzer 224-226; 53-55. Therefore, neither Mason nor Holzer could have relied on any information from Delisi at the time of the decision.

11.   On January 23, 2014, Mason convened a meeting of the senior employees in the communications group, in which Holzer (who was traveling) participated by phone. Finn, Leahy, and Finn's other newly hired direct report, Richard Adamonis, were not invited. Six employees participated, plus the McKinsey consultant, Mr. Sethuraman. Mason Dep. at 72:9-73:10 (Exh. D). Mason said to the group that she had heard there were issues with the leadership of the team and wanted to get their input. Grandis Dep. at 34:22-35:9 (Exh. N); Goldstein Dep. at 18:17-21 (Exh. O).

<u>Response</u>:       This is partially disputed.  Mason told the group that she and Lawrie planned to take action (apparently regarding Finn) at the start of the meeting before she heard from the Communications staff.  Eisele 93-94; see also Grandis 35 (Mason shared views first); Goldstein 18-19 (similar). See Response to No. 12.

12.   Memories of the participants differ as to who said what during this meeting, but all agree the group expressed concerns about the leadership of the team, the lack of collaboration, and lack of respect. Ashbrook Dep. at 17:20-18:10 (Exh. P); Delisi Dep. at 55:18-22 (Exh. Q); Goldstein Dep. at 20:8-21 (Exh. O); Grandis Dep. at 39:8-14 (Exh. N); Williams Dep. at 45:6-48:22 (Exh. R); EiseleDep. at 33:10-15 (Exh. S). Ms.Holzer prepared a summary of points made during the meeting that includes the following:

- ▪ "We have very poor leadership from the top";

- ▪ "We have two leaders that are not acting as a team, they are creating friction";

- "Our leaders have bad credibility with L2s [i.e., direct reports to the CEO], everyone finds them difficult to work with, this makes our jobs harder because we are in the middle";

- "There is an intentional lack of collaboration, they try not to do it";

- "We are not a world class communication function because of the lack of values" and

- "Everyone is working too hard to not be valued."

E-mail from Holzer to Mason, Jan. 28, 2014 (Exh. T).

    <u>Response</u>:    This is mostly disputed. All of the Communications staff, plus

Sethuraman, testified unequivocally that Leahy was not mentioned in the January 23, 2014,

meeting. For example, Anne Eisele testified about the January 23 meeting:

> A   I attended a meeting on January 23rd, as I recall … that I believe is the one you're talking about. I'm hesitating a little because the meeting I'm referring to did not involve or regard Mr. Leahy. It was about Mr. Finn.
> Q   Okay. And only Mr. Finn?
> A As I recall, yes.
> * * *
> Q   Okay. Did you refer to Bob Leahy during the meeting?
>    A   I do not recall my having referred to Bob Leahy. I also don't recall other people having done so. But I know -- I don't remember doing it myself. And if I might, the reason I don't recall any discussion certainly volunteered by me, as I can recall, [or] from others about Mr. Leahy at that meeting, I left the meeting feeling it had been about Jim Finn.

Eisele depo. at 84, 100. Christopher Grandis testified similarly:

> Q  Was Robert Leahy mentioned at all during this January 23rd meeting with Jo Mason and the   communications staff?
> A I don't remember his name coming up.
> Q Was Robert Leahy mentioned in any way other than by name at this January 23rd meeting with Jo Mason and the communications staff?
> A I don't think so.

Grandis depo. 42; see also Goldstein depo. 21 ("Q Did Robert Leahy's name get mentioned at all

in that meeting?  A It did not, not as I recollect."); Ashbrook at 19 (did not recall Leahy being

36

mentioned at all during January 23 meeting); Sethuraman depo. at 28 (did not think that Leahy was discussed at all during January 23 meeting).

In addition, Holzer did not take notes during the call at all. Holzer 86, 129-131, 255. The evidence shows that Holzer created those supposed "notes" on the day of the January 28, 2014, call with Lawrie and Mason. Exh. 21, 51 (metadata for Holzer "communication roundtable" notes show document created on 1/28/14, the day the document was emailed to Mason). The notes are not contemporaneous, and more importantly, directly contradict the testimony of all the communications staff members who testified that Leahy was not mentioned or discussed during that January 23, 2014, meeting led by Mason.

13. Immediately following the meeting, Holzer sent an e-mail to Mason with the subject line "Terrible," saying she had heard the discussion and had notes. Mason replied saying "poor things." Holzer Dep. at 130:5-11 (Exh. L); E-mail from Mason to Holzer, Jan. 23, 2014 (Exh. U).

Response:      This is disputed. This email is consistent with the January 23, 2014, meeting being entirely about Finn, not Leahy. See Response to No. 12.

14. On January 28, 2014, a meeting was scheduled among Mr. Lawrie, Ms. Holzer, and Ms. Mason. Ms. Holzer, who was in Germany at the time, participated by phone. Ms. Holzer recommended that Leahy be terminated and Mr. Lawrie accepted the recommendation. Mr. Leahy's age was not a factor in Holzer's recommendation or in Lawrie's decision. Holzer Dep. at 149:3-7, 376:17-21 (Exh. L); LawrieDep. at 30:20-31:15, 147:13-149:22, 180:3-7 (Exh. B); Mason Dep. at 353:19-354:9 (Exh. D). In the same meeting, Mr. Lawrie also decided to fire Mr.

Finn (age 51), but had no reason to and did not consider firing Finn's other hire, Rich Adamonis (age 58).

Response:        This is mostly disputed.  Plaintiff does not dispute that the decision to fire Leahy was made on January 28, 2014, by Lawrie, Mason and Holzer.  Plaintiff disputes that Holzer was the moving force or the first one to recommend Leahy's firing.  Holzer 142-143, 149, 95, 135.  See Pltf's Opp. to Sum. Judg., at Part II.D.  Mason appears to be the moving force in firing Leahy, and her age bias was a factor, or so a jury could find.  The evidence in opposition to the conclusory assertion that "age had nothing to do" with it is really the entirety of the Fact section of Plaintiff's Summary Judgment Opposition filing, incorporated herein, see Pltf's Opp. to Sum. Judg., at Part II.

15.    Neither Lawrie nor Holzer had met Leahy as of January 28. Lawrie Dep. at 9:12-19 (Exh. B); Holzer Dep. at 53:20-54:1 (Exh. L). Mason had met Leahy only when she interviewed him before he was hired, and once when she reviewed slides he had prepared and complimented him on the work. Mason Dep. at 54:3-57:19 (Exh. D).

Response:        Disputed only to the extent that Leahy met with Mason more than one time while working on the powerpoint templates design project.  Mason was the only one of the three who knew what Leahy looked like and that Leahy could be described as an old gray haired man.  Leahy 148-149.

16.    Between the time of her recommendation and the date she terminated Leahy, Holzer had a further call with Mark Delisi, Leahy's only direct report, about Leahy and Finn.  Following that call, Delisi sent to Holzer a memorandum he had begun preparing in September 2013

38

entitled "Documenting Bobs Behavior," in which he stated among other things that Leahy "creates a very hostile workplace"; that Delisi has "never experienced management that is so vulgar, unethical and counter to the values of the company"; that Delisi believes "Bob is the ultimate bully"; and that "[Leahy] consistently belittles me and others on the Corp Comms team." E-mail from Delisi to Holzer, Jan. 31, 2014 (Exh. V).

Response:    This is disputed and immaterial.  The decision to fire Leahy was final before Holzer (or Mason) obtained any derogatory information from Delisi and so it played no part in the decision.  See Response to No. 10. In addition, Delisi substantially edited and revised that document before sending it to Holzer, and the majority of the items in that memo do not appear to have been written contemporaneously, or so a jury could find. Delisi 74.

17.  On February 4, Holzer met with Leahy and informed him he was being terminated for performance because of a violation of CSC's "CLEAR" values. Holzer Dep. at 54:11-55:2 (Exh. L). Leahy was age 61 at the time he was terminated. Leahy Dep. at 17:13-18 (Exh. C).  At the same time, Lawrie met with Finn and terminated him. Holzer Dep. at 104:3-105:2  (Exh. L). Lawrie, Holzer, and Mason thereafter met with the communications group to announce  the changes. At that meeting and in e-mails to Mason, members of the team thanked Lawrie for  his actions. Lawrie Dep. at 170:18-172:15 (Exh. B); E-mail from Adamonis to Mason, Feb. 4,  2014 (Exh. W); E-mail from Bingemann to Mason, Feb. 4, 2014 (Exh. X).

Response:    This is disputed and immaterial.  Anything that happened after the decision was made could not have affected the decision.  The emails from the Communications team in response to the CEO's meeting with them do not appear unusual or significant.  In

addition, the emails do not reflect adversely on Leahy because the major change, indeed the only written announcement, concerned Finn.  Exh. 22.

18. - 21.  This is immaterial.  These are separate contracts which stand separate from any employment contract.  CSC admitted that the only thing Leahy had to do to vest in his stock options and RSUs was to remain employed.  If CSC interfered arbitrarily or in bad faith with Leahy's ability to remain employed through his vesting date (including a termination based on no cause), Leahy is entitled to the value of these contracts because of the prevention doctrine.  See Pltf's Opp. to Sum. Judg., at Part IV.F.

_/s/_____
Stephen Z. Chertkof (34243)
Richard A. Salzman* (*admitted pro hac vice*)
HELLER, HURON, CHERTKOF & SALZMAN
1730 M Street, NW, Suite 412
Washington, DC  20036
(202) 293-8090
Fax: (202) 293-7110
szc@hellerhuron.com
ras@hellerhuron.com

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by email and

hand on January 30, 2015, on:


William H. Jeffress, Jr.
Heather Souder Choi
Sterling A. Marchand
Baker Botts
The Warner
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004-2400


_____/s/_____
Stephen Z. Chertkof
