IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

ROBERT LEAHY,                    )
                                 )
                                 )
       Plaintiff,                )
                                 )
           v.                    )     1:14cv665(JCC/TRJ)
                                 )
COMPUTER SCIENCES CORP.,         )
                                 )
                                 )
       Defendant.                )

**M E M O R A N D U M   O P I N I O N**

This matter is before the Court on Defendant Computer Sciences Corp.'s ("Defendant" or "CSC") Motion for Summary Judgment.  [Dkt. 33.]  Roberty Leahy ("Plaintiff" or "Leahy" ) alleges Defendant impermissibly terminated him because of his age, in violation of the Age Discrimination in Employment Act, and breached its stock options and restricted stock unit agreements with Plaintiff as a consequence of that termination. For the following reasons, the Court will grant in part and deny in part the motion.

**I. Background**

The following facts are not in dispute.[1]  James Finn ("Finn") was hired by CSC as Vice President for Corporate

_____

[1] Plaintiff has agreed that he does not dispute the following facts.  (Pl.'s Opp. [Dkt. 36] at 31-40.)  For ease, then,

Communications in March 2013, reporting directly to CSC's CEO, Michael Lawrie ("Lawrie"). (Def.'s Mem. in Supp. [Dkt. 34] at 6.) Two months later, at Finn's request, CSC hired Plaintiff. (*Id.*) Finn had known Leahy for years, wanted Leahy to serve as his "utility infielder" in corporate communications, and created a position for Plaintiff that previously did not exist. (*Id.*) Plaintiff was 61 years old at the time of his hire. (*Id.*) Before making the job offer, Plaintiff was interviewed by Lawrie's Chief of Staff, Joanne Mason ("Mason"), who found him qualified. (*Id.*)

At the start of his tenure with CSC, CSC and Plaintiff entered into a stock option agreement. (*Id.* at 11.) Under the agreement, Plaintiff was not entitled to exercise the stock options until they had vested. (*Id.*) None of the shares were scheduled to vest before July 15, 2014. (*Id.* at 12.) Should Plaintiff be terminated at the age of 61 or younger for any reason, then the unvested shares would terminate on the date of his termination. (*Id.*) Plaintiff and CSC also entered into a restricted stock unit award agreement ("RSU Agreement"). Under the RSU agreement, Plaintiff was not entitled to any RSU shares until vesting, which was scheduled for July 15, 2016. (*Id.*) If Plaintiff was terminated at 61 years of age or younger, then the

citations will refer to Defendant's Memorandum in Support of its Motion.  Plaintiff's objections that do not relate to a disputed an issue of fact are noted in the footnotes.

unvested RSU shares would terminate on the date of his termination. (*Id.*)

CSC maintains human resources policies requiring employees "to conduct and present themselves at all times in a highly professional and reliable fashion and to be sensitive to circumstances in which their conduct is not acceptable." (*Id.* at 7 (quoting Def.'s Mem. in Supp., Ex. F, at 1-3).) Unacceptable conduct includes "[c]onduct which demonstrates lack of desire or ability to work in the spirit of harmony or cooperation with the efforts of coworkers, customers, subordinates, or superiors, including unlawfully discriminatory behavior of any type" or "[a]ny conduct, whether verbal, physical or both, which is inappropriate, indecent, or so disruptive of the work environment that it has no place in a professional setting." (*Id.*) CSC also maintains a Code of Business Conduct that identifies CSC's corporate values as: "Client Focused"; "Leadership"; "Execution Excellence"; "Aspiration"; and "Results." (*Id.*) These values are referred to by the acronym "CLEAR." (*Id.*) The value of "Leadership" is described as "lead[ing] from the front, displaying our integrity and using facts to support our straight talk. We create an environment for positive change built on collaboration and trust." (*Id.*)

Beginning at least as early as December 2013, Lawrie received reports that there were behavioral issues with the leadership of the corporate communications group. (*Id.*)[2] Lawrie heard from some of Finn's peers at CSC that he had lost credibility with them and had erratic behavior. (*Id.* at 8.) Lawrie also learned that seven of fewer than thirty people in the corporate communications group had left within the last three to six months. (*Id.* at 7-8.)

Mason also heard some reports of problems in the corporate communications group in in December 2013. Mason spoke with Edda Van Winkle ("Van Winkle"), a member of CSC's corporate communications staff who had submitted her resignation. (*Id.* at 8.) Van Winkle reported to Mason that earlier in 2013, Van Winkle had a negative encounter with Plaintiff, who, at that time had only been at CSC for a few weeks. (*Id.*) Van Winkle stated Plaintiff "told me in a threatening manner that I had six months to prove myself . . . ." (*Id.*)[3] Around the same time as Mason's conversation with Van Winkle, Sandeep Sethuraman, a

---

[2] Plaintiff argues that this is "largely immaterial" as the reports of allegedly poor behavior were related to Finn, not himself, and therefore have nothing to do with his firing. (Pl.'s Opp. at 32.)  However, he does not contend that Lawrie did not hear about behavioral issues in the corporate communications group, so it is not a disputed factual issue that must be resolved at trial.

[3] Plaintiff does not dispute this factual allegation, though he notes that prior to this, any knowledge Van Winkle had about Plaintiff's alleged poor behavior was based on hearsay, not first-hand knowledge. (Pl.'s Opp. at 33.)

McKinsey consultant working at CSC, told Mason of an intemperate and profane email sent by Finn to approximately eight members of Finn's staff. (*Id.*)[4] Sethuraman told Mason there was a "toxic environment" in the corporate communications group. (*Id.* at 8.) Mason informed Lawrie and Sunita Holzer ("Holzer"), CSC's Vice President of Human Resources, that she thought there was a problem with the group based on these reports. (*Id.*)

Lawrie commissioned an investigation of the corporate communications group. (*Id.*)[5] Additionally, he asked Mason to meet with the corporate communications staff to get their feedback. (*Id.* at 8-9.) On January 23, 2014 Mason convened a meeting of senior employees in the communications group, which Holzer, who was on business travel in Germany, participated by phone. (*Id.* at 9.)[6] Sethuraman and six CSC employees participated. (*Id.*) Finn, Leahy, and Finn's newly hired other direct report Richard Adamonis ("Adamonis"), were not invited.

---

[4] Plaintiff does not dispute this factual allegation but asserts that it is immaterial as it refers only to Finn. (Pl.'s Opp. at 33.)

[5] Plaintiff and Defendant dispute who Lawrie charged to conduct this investigation. Plaintiff contends it was Mason, who in turn delegated to Holzer. (Pl.'s Opp. at 34.) Defendant contends Lawrie asked Holzer to investigate. (Def.'s Mem. in Supp. at 8.)

[6] Plaintiff does not dispute that Holzer participated in this call by telephone, but some of the meeting participants dispute whether Holzer was on the line during the meeting. (*See* Pl.'s Opp., Grandis Depo. at 23; Goldstein Depo. at 17.) As the parties are in agreement that Holzer participated in the meeting remotely, this fact is deemed admitted.

(*Id.*)  Two days before this meeting occurred, on January 21, 2014, Mark Delisi ("Delisi"), head of CSC's Corporate Responsibility program and Plaintiff's only direct subordinate, submitted his resignation.  (*Id.*)

Lawrie, Holzer, and Mason met on January 28, 2014. (*Id.* at 10.)  It was at this meeting that the decision to fire Plaintiff was made.  (*Id.*)[7]  At the same meeting, the decision to fire Finn was made.  (*Id.*)  As of this date, neither Lawrie nor Holzer had met Plaintiff.  (*Id.*)  Mason had interacted with Plaintiff on a handful of occasions: once when she interviewed him for the position and again in connection with Power Point slides he prepared.  (*Id.* at 10-11.)[8]

After the decision to fire Plaintiff had been made but before Plaintiff was actually terminated, Holzer spoke with Delisi.  (*Id.* at 11.)  Following that call, Delisi sent Holzer a memorandum he had begun preparing in September 2013 in which he stated, among other things, that Plaintiff "creates a very hostile workplace"; that Delisi had "never experienced management that is so vulgar, unethical, and counter to the values of the company;" that Delisi believed "[Plaintiff] is the

---

[7] As noted *infra*, the parties dispute who made the decision to fire Plaintiff.
[8] Plaintiff contends he met with Mason on more than one occasion related to the Power Point slides.  The Court does not find it material to pin down an exact number of times Mason talked to Plaintiff only to note that according to the parties, the contact between Mason and Plaintiff was minimal.

ultimate bully"; and that "[Plaintiff] constantly belittles me and others on the Corp. Comms. Team." (*Id.*)[9]

On February 4, 2014, Holzer met with Plaintiff and informed him he was being terminated for performance because he violated the "CLEAR" values. (*Id.*)  At the time of his termination, Plaintiff was 61 years old. (*Id.*)  At the same time, Lawrie met with Finn and terminated him as well. (*Id.*)

Plaintiff filed suit in this Court on June 4, 2014, alleging two causes of action: age discrimination, in violation of the Age Discrimination in Employment Act, 29 U.S.C. 623(a)(1) ("Count One"); and breach of contract of the stock option agreement and the RSU Agreement ("Count Two"). (Compl. [Dkt. 1] ¶¶ 16-26.)  Defendant timely moved for summary judgment. (Mot. for Summ. J. [Dkt. 33].)  Having been fully briefed and argued, this motion is ripe for disposition.

## II. Legal Standard

Summary judgment is appropriate only where, on the basis of undisputed material facts, the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex*

---

[9] Plaintiff claims that this is "disputed and immaterial." (Pl.'s Opp. at 39.)  However, both parties are in agreement that Holzer's conversation with Delisi occurred after the decision to fire Plaintiff had been made. (*Id.; see* Def.'s Mem. in Supp. at 11.)  While Plaintiff claims that Delisi made substantial edits to the memorandum before sending it and that there are questions as to whether it was prepared contemporaneously, he does not dispute the fact that the memorandum exists and that Holzer received it with the aforementioned comments.

*Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  The moving party always bears the initial burden of "informing the district court of the basis for its motion," and identifying the matter "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323.  Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *see also Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc.*, 673 F.3d 294, 299 (4th Cir. 2012) (stating the opposing party must "come forward with specific facts showing that there is a genuine issue for trial.").  Importantly, the non-moving party must show more than some metaphysical doubt as to the material facts.  "[T]he non-moving party 'may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.'" *Hughes v. Bedsole,* 48 F.3d 1376, 1381 (4th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986)).

      In reviewing the record on summary judgment, the Court "must draw any inferences in the light most favorable to the non-movant" and "determine whether the record taken as a whole could lead a reasonable trier of fact to find for the non-movant." *Brock v. Entre Computer Ctrs., Inc.*, 933 F.2d 1253,

1259 (4th Cir. 1991) (citations omitted).  "[A]t the summary
judgment stage the judge's function is not himself to weigh the
evidence and determine the truth of the matter but to determine
whether there is a genuine issue for trial." *Anderson,* 477 U.S.
at 249.  Where there is conflicting evidence, the court must
credit the evidence of both sides and acknowledge that there is
a genuine issue of material fact that cannot be resolved by
summary judgment.  *See Tolan v. Cotton*, 134 S. Ct. 1861, 1868-69
(2014) (stating that summary judgment is inappropriate where
each side has put forward competent evidence that raises a
dispute about a material fact).

### III. Analysis

#### A. Age Discrimination

The Age Discrimination in Employment Act ("ADEA")
makes it "unlawful for an employer . . . to discharge any
individual . . . because of such individual's age." 29 U.S.C. §
623(a)(1).  To establish a claim for age discrimination under
the ADEA, a plaintiff must prove by a preponderance of the
evidence that age was not merely a motivating factor of the
challenged adverse employment action but was in fact its "but
for" cause.  *Marlow v. Chesterfield Cnty. Sch. Bd.*, 749 F. Supp.
2d 417, 427 (E.D. Va. 2010) (citing *Gross v. FBL Fin. Servs.,
Inc.*, 557 U.S. 167, 177 (2009)).  Evidence that age was the "but
for" cause of the challenged adverse employment action may be

either direct or circumstantial.  *Gross*, 557 U.S. at 177–78

(citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 141–

43 (2000)).

The Fourth Circuit has recognized two ways in which a

plaintiff can establish an ADEA claim: first, through evidence

showing that age bias motivated the employment decision under

the so-called "mixed-motive" method; and second, through

circumstantial evidence of discrimination under the "pretext"

method established in *McDonnell Douglas Corp. v. Green*, 411 U.S.

792, 802–05 (1973), and its progeny.  *Mereish v. Walker*, 359

F.3d 330, 334 (4th Cir. 2004) (citation omitted); *see Hill v.*

*Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th

Cir. 2004) (en banc).  Finding no direct or circumstantial

evidence of discrimination in the record, the Court applies the

familiar *McDonnell Douglas* burden-shifting framework.  *Mereish*,

359 F.3d at 334; *see Hill*, 354 F.3d at 284 (stating direct

evidence is "evidence of conduct or statements that both reflect

directly the alleged discriminatory attitude and that bear

directly on the contested employment decision.") (citation and

internal quotation marks omitted).

The second method of averting summary judgment is to

proceed under the *McDonnell Douglas* "pretext" framework, under

which the employee, after establishing a prima facie case of

discrimination, demonstrates that the employer's proffered

10

permissible reason for taking an adverse employment action is actually a pretext for discrimination. *Hill*, 354 F.3d at 285. Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of discrimination by a preponderance of the evidence. *Mereish*, 359 F.3d at 334 (citing *McDonnell Douglas*, 411 U.S. at 802). The burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the plaintiff's termination. *Id.* If a defendant satisfies this burden, the presumption of discrimination created by the prima facie case disappears. *Id.* A plaintiff must then prove that the defendant's proffered justification is pretextual. *Id.* This final burden on a plaintiff "merges with the ultimate burden of persuading the court that [the plaintiff] has been a victim of intentional discrimination." *Id.* At all times, the burden of proving age discrimination rests with the plaintiff. *Id.*

To establish a prima facie case of unlawful age discrimination, Plaintiff must show that (1) he is a member of a protected class; (2) he suffered adverse employment action; (3) he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action; and (4) following his discharge, the position remained open or he was replaced by a substantially younger individual with comparable qualifications. *Hartman v. Univ. of*

11

*Maryland at Baltimore*, No. 14-1229, 2014 WL 6981356, at *3 (4th Cir. Dec. 11, 2014) (citing *Hill*, 354 F.3d at 285); *see O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312 (1996) (citation and internal quotation mark omitted) (stating the prima facie case requires evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion).

Neither party disputes that Plaintiff is a member of the protected class. *See* 29 U.S.C. § 631(a) (stating ADEA applies to ban discrimination based on age of individuals forty years or older); *O'Connor*, 517 U.S. at 312. The parties also do not dispute that Plaintiff was qualified for the job when he was hired. As proof that he was meeting CSC's legitimate expectations, Plaintiff avers, and Defendant does not dispute, the following: Mason was pleased with the work Plaintiff had done on one project (Mason Dep. at 57)[10] and Finn was satisfied with his performance. (Holzer Dep. at 69, 75, 145.)

As to prongs three and four of the prima facie case, Plaintiff alleges that there was a perception that CSC's workforce was too old. (*See* Finn Dep. at 18 ("[Mason] said Jim, you're hiring old farts like Bob Leahy, people on the way down,

---

[10] References to deposition testimony are citations to the exhibits attached to Plaintiff's Opposition. For ease of citation, the Court will use the deponent's name rather than the exhibit number.

not on the way up."); Lowe Dep. at 16-17 (stating that industry
analysts perceived CSC's workforce to be "old gray haired
guys."). Standing alone, this does not help Plaintiff make his
case. However, Leahy was fired without any prior disciplinary
process, contrary to CSC's human resources policy and its
standard practice. (Holzer Dep. at 139-40.); (Pl.'s Opp., Ex.
3, at 3-6.).[11] This leads to the inference that despite his
qualifications and performance, Plaintiff was fired because of
his age. Furthermore, as discussed below, there is a genuine
issue of material fact as to the circumstances surrounding
Plaintiff's firing. Finally, Plaintiff's position was created
for him. There is a genuine issue of material fact as to who
replaced Plaintiff. Plaintiff claims Mason, and Defendant
claims that many people absorbed the work. (Lawrie Dep. at 175;
Def.'s Reply [Dkt. 42], Ex. FF.) Drawing all inferences in the

---

[11] The policy requires that the employee's supervisor identify
problems and counsel the employee, that the employee be
permitted to respond to any allegations, and that the company is
responsible for creating a written record documenting how the
incident was investigated, the facts learned, a summary of
meetings with the employee, and the employee's explanation of
facts. (Pl.'s Opp., Ex. 3, at 3-6.) The policy also details a
series of progressive disciplinary steps. (*Id.*) Termination is
appropriate only after the employee has been warned. (*Id.*) Any
suspension or dismissal must be accompanied by a written
memorandum of disciplinary action and must be approved and
signed by the next higher level of management and human
resources before the employee is informed of the discipline.
(*Id.*) No written documentation surrounding Plaintiff's firing
has been produced, and Holzer is not aware of any. (Pl.'s Opp.
at 15; Holzer Dep. at 139-40.) However, the preamble to the
policy notes that it is not mandatory. (*Id.*)

non-moving party's favor at this stage, as the Court must, the Plaintiff has stated a prima facie case of age discrimination. *See Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 515 (4th Cir. 2006) (noting plaintiff's burden is not "onerous.")

As Plaintiff has met his prima facie case, the burden now shifts to Defendant to put forward a legitimate, non-discriminatory reason for Plaintiff's firing.  The parties agree that employment at CSC is at-will. (Def.'s Mem. in Supp. at 7.) Defendant contends that it fired Plaintiff for violation of its CLEAR values. (Def.'s Mem. in Supp. at 11.)  Defendant points to three pieces of information about Plaintiff as motivating its decision to fire him: Van Winkle's comments, Mason's January 23 meeting with the communications staff, and Delisi's comments about Leahy.

First, as to Van Winkle, Van Winkle testified that she spoke with Mason in December, after she had submitted her resignation. (Van Winkle Dep. at 13.)  Mason initiated the call, as she wanted to know why Van Winkle was leaving the company. (*Id.* at 14-15.)  Van Winkle stated that she was not complaining about Plaintiff, but rather "informing" Mason of Plaintiff's behavior. (*Id.*)  Van Winkle told Mason about the "six months to prove herself" interaction with Plaintiff, which took place in July of 2013. (*Id.* at 16, 36).  According to Van Winkle, Mason was "primarily asking" about Finn and his

14

leadership.  (*Id.* at 18.)  Van Winkle also told Mason that her
reason for leaving CSC was for a better career opportunity,
though "leadership and climate was a contributing factor."  (*Id.*
at 24.)  Plaintiff has not put forward any evidence to dispute
these facts.  (Pl.'s Opp. at 33.)

      Second, Defendant and Plaintiff's version of the
January 23 corporate communications meeting are different.
According to Defendant, the group expressed concern about both
Leahy and Finn in the meeting.  (Def.'s Mem. in Supp. at 9.)  In
support, they point to Holzer's notes of the call.  However, as
Plaintiff points out, participants in that meeting did not
recall Plaintiff's name coming up during that meeting.  ((Eisele
Dep. at 84, 100) ("I attended a meeting on January 23rd, as I
recall . . . that I believe is the one you're talking about.
I'm hesitating a little because the meeting I'm referring to did
not involve or regard Mr. Leahy.  It was about Mr. Finn.");
(Grandis Dep. at 42) ("I don't remember [Plaintiff's] name
coming up [in the January 23 meeting].");  (Goldstein Dep. at 21)
("Q: Did Robert Leahy's name get mentioned at all [in the
January 23] meeting? A: It did not.");  (Ashbrook Dep. at 19);
(Sethuraman Dep. at 28.)  Furthermore, Holzer's testimony
contradicts Defendant's assertion that the meeting was focused
on Plaintiff.  At one point in her deposition, she states that
she did not take notes during the January 23 meeting; at another

point, she stated that the notes referred to both Plaintiff and Finn, though certain statements in the notes could not be attributable to Plaintiff.  (Holzer Dep. at 86, 130.) Given that Plaintiff contends that the January 23 meeting was really about Finn and can point to discrepancies in the record in support of that statement, Plaintiff has raised a genuine issue of material fact as to whether the January 23 meeting was related to the decision to fire Plaintiff.

Finally, Defendant asserts that Delisi's comments about Plaintiff were part of the decision to fire Plaintiff. (Def.'s Mem. in Supp. at 11.)  However, Delisi testified that he never complained to Mason about Plaintiff.  (Delisi Dep. at 15-17, 47, 84.)  Delisi did talk to Holzer about Plaintiff and his alleged abuses, but this conversation took place on January 30, two days after the decision to fire Plaintiff had been made. (Delisi Dep. at 15-17, 47, 84; Holzer Dep. at 53-55, 224-26.) This testimony therefore raises a genuine issue of material fact as to whether Delisi's comments had an impact on the decision to fire Plaintiff.[12]

_____

[12] In its reply, Defendant attaches an email exchange that begins on January 22, 2014 between Delisi and Mason as a follow up to a phone call held the day prior.  (Def.'s Reply [Dkt. 42], Ex. LL.)  Defendant argues that this email exchange shows that Mason and Delisi discussed Plaintiff's behavior prior to the January 28, 2014 decision to fire Plaintiff.  (Def.'s Reply at 12.) However, the email exchange does not specifically mention Plaintiff.  Rather, Delisi expresses thanks for the "leadership

Additionally, there is a genuine issue of material fact as to who conducted the "investigation" of Plaintiff and who made the decision to fire Plaintiff.  In his deposition, Lawrie testified that he asked Holzer and Mason to investigate Plaintiff.  (Lawrie Dep. at 20.)  According to Lawrie, Mason was not involved in Plaintiff's firing.  Holzer made the recommendation to fire Plaintiff, which Lawrie accepted. (Def.'s Mem. in Opp. at 10; Lawrie Dep. at 30, 147, 180.)  But Holzer's deposition testimony states that she was not investigating Plaintiff.  (Holzer Dep. at 135.)  While Holzer did recommend firing Plaintiff, she testified that Mason also recommended to Lawrie that Planitiff be fired.  Mason, a close confidante of Lawrie, was in the room when the decision to fire Plaintiff was made.  (Holzer Dep. at 139; Def.'s Mem. in Supp. at 10.)  Whether Mason was involved in the decision to fire

---

example you are showing in addressing the challenges we discussed." (Def.'s Reply, Ex. LL, at 3.)  The "challenges" are not further defined.  Later in the exchange, Delisi promises to "speak up" on the January 24 call.  (*Id.* at 1.)  However, Plaintiff points to Delisi's deposition testimony, in which Delisi cannot recall clearly his comments about Plaintiff at the January 23 meeting, which arguably was not even about Plaintiff. (Notice [Dkt. 47] at 56.)  Further, the deposition testimony illustrates that Delisi and Mason had conversations about restructuring the corporation communications group, which could be the challenges to which Delisi referred in his email (as opposed to Defendant's inference that "challenges" referred to problems with Plaintiff).  (*Id.* at 49-51.)  Therefore, Plaintiff has demonstrated that there is a genuine issue of material fact as to whether Delisi's comments played in Plaintiff's termination.

Plaintiff is significant.  Both parties agree that at some point
in time Mason used the term "old farts" to refer to older
workers at CSC, and Finn claims Mason used the term to refer
specifically to Plaintiff.  (Lawrie Dep. at 245-46; Finn Dep. at
58; Scott Dep. at 58-59.)  Lawrie claims that age was not a
factor in the decision to fire Plaintiff, though he also stated
that he was not the one who recommended or advised that
Plaintiff be fired but rather "accepted" Holzer's
recommendation.  (Lawrie Dep. at 179-180.)  If Mason had
influence over the decision to fire Plaintiff, then the
potential bias, if any, that she brought to that decision
becomes much more relevant.  Furthermore, at the January 28
meeting of Holzer, Lawrie, and Mason, she was the only one of
the three to have previously met Plaintiff.  (Def.'s Mem. in
Supp. at 10.)  Plaintiff has presented a genuine issue of
material fact as to whether Mason was a decision-maker and, if
she was, whether she impermissibly relied on Plaintiff's age in
firing him.

        Taking all of this together, Plaintiff presents a
genuine issue of material fact as to whether Defendant had a
legitimate, non-discriminatory reason for firing Plaintiff.  As
of January 28, Plaintiff claims that Holzer, who Defendant
argues conducted the investigation, had never met Leahy, had not
spoken with Van Winkle, had not yet talked to Delisi, and heard

nothing derogatory about Plaintiff in the January 23
communications meeting.  Therefore, there is a genuine issue of
fact as to what were the reasons behind the decision to fire
Plaintiff.

### B. Breach of Contract Claim

Plaintiff argues Defendant is in breach of contract of
his stock options and RSU agreements for firing Plaintiff
arbitrarily and in bad faith, pointing to the prevention
doctrine in support.  The prevention doctrine is a generally
recognized principle of contract law.  If a promisor prevents or
hinders fulfillment of a condition to his performance, the
condition may be waived or excused.  *Moore Bros. Co. v. Brown &
Root, Inc.*, 207 F.3d 717, 725 (4th Cir. 2000) (citation
omitted).  The Supreme Court of Virginia recognized the
prevention doctrine in *Parrish v. Wightman*, 34 S.E.2d 229, 232
(Va. 1945).  Virginia law does not require the plaintiff to
prove "but for" causation.  Rather, as that court specifically
noted, "[i]t is as effective an excuse of performance of a
condition that the promisor has hindered performance as that he
has actually prevented it." *Parrish*, 34 S.E.2d at 232; *see also
Whitt v. Godwin*, 139 S.E.2d 841, 844 (1965) (citation omitted).
However, the prevention doctrine does not apply "when the
hindrance is due to some action of the promisor which he was

19

permitted to take under either the express or implied terms of the contract." *Whitt*, 139 S.E.2d at 844.

Here, Plaintiff has cited no case law in support of the proposition that the prevention doctrine applies to allow an employee to continue to participate in a stock options agreement after that employee has been fired arbitrarily, in bad faith, or on the basis of illegal discrimination. Even assuming, *arguendo*, that Defendant's termination on February 4, 2014 was the result of illegal discrimination, there is no guarantee that Plaintiff would have still been employed at CSC on the dates the stock options and RSUs were to vest. Plaintiff does not dispute that employment at CSC is at will, and Defendant would have been well within its rights to terminate Plaintiff with or without cause had he remained at CSC after February 4, 2014. *See Cioni v. Globe Specialty Metals, Inc.*, 2014 WL 2965707, at *3-4 (D.N.J. July 1, 2014) (noting that at-will employment meant there would be no promises that employee would be employed on the date stock options vested); *Ott v. Alger Mgmt. Inc.*, No. 11 Civ. 4418 (LAP), 2012 WL 4767200, at *8 (S.D.N.Y. Sept. 27, 2012) (stating that an at-will employee's breach of contract claim for unvested stock options were too speculative because it was unclear whether plaintiff would still be employed by defendant on the date the options vested). Therefore, Plaintiff

cannot prevail on this claim as a matter of law, and judgment will be entered for Defendant on this count.

### IV. Conclusion

For the aforementioned reasons, the Court will grant in part and deny in part the motion.  An appropriate order will follow.


_____
/s/
February 12, 2015                      James C. Cacheris
Alexandria, Virginia        UNITED STATES DISTRICT COURT JUDGE